The Honorable David G. Estudillo

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| ARI HOFFMAN, BRANDI KRUSE, and JONATHAN CHOE, | Case No. 3:26-cv-5214-DGE |
| Plaintiffs, | **THE STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| WASHINGTON STATE HOUSE OF REPRESENTATIVES, CHIEF CLERK BERNARD DEAN, in his official capacity, THE LEGISLATURE OF THE STATE OF WASHINGTON; THE STATE OF WASHINGTON and the WASHINGTON STATE CAPITOL CORRESPONDENTS ASSOCIATION, | NOTE ON MOTION CALENDAR: March 9, 2026 @ 1:30pm |
| Defendants. | |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTS ............................................................................................................... 2

        A.      House Floor Press Access ...................................................................... 4

        B.      CCA Guidelines ..................................................................................... 5

        C.      Plaintiffs' Ineligibility ........................................................................... 6

                1.      Ari Hoffman ................................................................................ 6

                2.      Brandi Kruse .............................................................................. 8

                3.      Jonathan Choe .......................................................................... 11

III.    ARGUMENT ................................................................................................... 13

        A.      Plaintiffs must, but cannot, satisfy a stringent standard..................... 13

        B.      Plaintiffs' claims are not likely to succeed. ........................................ 13

                1.      Plaintiffs' First Amendment claim is meritless. ...................... 13

                2.      Plaintiffs' Art. I, section 5 claim is meritless......................... 21

                3.      Plaintiffs' Due Process claims are meritless......................... 22

                4.      Plaintiffs' non-delegation claim is meritless......................... 25

        C.      Plaintiffs are not likely to suffer irreparable harm............................ 25

        D.      The equities do not favor Plaintiffs, and an injunction would not be in the public interest........................................................................................ 26

IV.     CONCLUSION ................................................................................................ 26

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - i
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Hinkle*,
322 P.2d 844 (1958) ...........................................................................................22

*Andersen v. United States*,
612 F.2d 1112 (9th Cir. 1980) ...........................................................................13

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......................................................................................15, 16

*Associated Gen. Contractors of Wash. v. State*,
518 P.3d 639 (Wash. 2022) ................................................................................25

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ...............................14

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025), *cert. denied*, No. 25-338,
2025 WL 3260204 (U.S. Nov. 24, 2025) ................................................... Passim

*Auto. United Trades Org. v. State*,
357 P.3d 615 (Wash. 2015) ................................................................................25

*Baird v. Bonta*,
81 F4th 1036 (9th Cir. 2023) .............................................................................26

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ............................................................................................14

*Brower v. State*,
969 P.2d 42 (Wash. 1998) ..................................................................................25

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .............................................................................26

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ..............................................................................14, 15, 16

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .............................................................................13

*Getty Images News Servs. Corp. v. Dept. of Defense*,
193 F. Supp. 2d 112 (D.D.C. 2002) ...................................................................23

*Hill v. Colorado*,
530 U.S. 703 (2000) ............................................................................................23

*Jacobsen v. U.S. Postal Serv.*,
812 F.2d 1151 (9th Cir. 1987) .......................................................................14, 15

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - ii
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

*John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*,
  994 F.3d 602 (7th Cir. 2021) ............................................................................ Passim

*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) ........................................................................................14

*McGary v. Inslee*,
  No. C23-5388 BHS, 2023 WL 5822280 (W.D. Wash. Sep. 8, 2023)..........................26

*Madsen v. Women's Health Ctr.*,
  512 U.S. 753 (1994) ....................................................................................................19

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ....................................................................................................22

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018) .........................................................................................................15

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983) .................................................................................................15, 16

*Plintron Techs. USA LLC v. Phillips*,
  No. C24-93, 2024 WL 553718 (W.D. Wash. Feb. 12, 2024)................................13, 26

*Roe v. Critchfield*,
  137 F.4th 912 (9th Cir. 2025) ......................................................................................13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .....................................................................................................19

*Sanders v. City of Seattle*,
  156 P.3d 874 (Wash. 2007) .........................................................................................21

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977)..........................................................................22, 23, 24

*Smith v. Plati*,
  258 F.3d 1167 (10th Cir. 2001) ...................................................................................14

*State v. Beaver*,
  336 P.3d 654 (Wash. Ct. App. 2014), *aff'd*, 358 P.3d 385 (2015) .............................22

*State v. Coe*,
  679 P.2d 353 (Wash. 1984) .........................................................................................22

*State v. Noah*,
  9 P.3d 858 (Wash. Ct. App. 2000).................................................................................22

*TGP Commns., LLC v. Sellers*,
  No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022) ...........................14, 19, 21

*United States v. Nassif*,
  97 F.4th 968 (D.C. Cir.), *cert denied,* 145 S. Ct. 552 (2024)................................16, 17

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - iii
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

*Utah Policy Watch, Inc. v. Musselman*,
No. 2:25-cv-00050-RJS, 2025 WL 2772470 (D. Utah Sep. 29, 2025),
*appeal docketed*, No. 25-4124 (10th Cir. Sep. 30, 2025) ....................................................... 19, 23

*Winter v. Nat. Res. Def. Council, Inc*.,
555 U.S. 7 (2008) .................................................................................................................. 13, 26

*World Wide Video of Wash., Inc. v. City of Spokane*,
103 P.3d 1265 (Wash. Ct. App. 2005) ........................................................................................ 21

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

## I.   INTRODUCTION

Plaintiffs Ari Hoffman, Brandi Kruse, and Jonahan Choe ask for the extraordinary remedy of a temporary restraining order ("TRO") and preliminary injunction requiring Defendants the Washington State House of Representatives, Chief Clerk Bernard Dean, and the State of Washington (collectively, "House") to grant Plaintiffs press credentials they do not qualify to receive.  Because Plaintiffs are not entitled to such relief, their motion should be denied.

The House floor and adjoining press areas are nonpublic fora.  They are controlled legislative workspaces where elected Members debate and vote on legislation.  Because those spaces are not by tradition nor designation for public communication but instead exist to facilitate the functioning of the legislative branch, the House may limit access so long as its rules are reasonable and viewpoint neutral.  The House's press credentialing policy ("Press Policy") satisfies these standards.  It applies viewpoint neutral criteria, informed by longstanding Capitol Correspondents Association ("CCA") guidelines ("Guidelines"), designed to ensure that individuals granted floor access are bona fide journalists serving as independent observers, not participants in the political process.

Plaintiffs did not meet those criteria.  Hoffman and Kruse were actively involved in political advocacy concerning initiatives before the Legislature.  Choe applied for a press pass as a representative of a political think tank, not a news organization.  The House denied Plaintiffs' requests for passes not because of Plaintiffs' viewpoints, but because they were participants in the political arena rather than independent monitors of legislative proceedings.  Plaintiffs cannot succeed on their claims for violation of press rights under the federal or state constitutions.

Plaintiffs' Due Process claims fare no better.  The Press Policy is available to the public and sets forth intelligible criteria for eligibility.  Plaintiffs were informed of the factual bases for the denial of their applications and provided with an (immediate) opportunity to appeal.  Due process requires no more.

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 1
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

And Plaintiffs' non-delegation argument collapses at the threshold. The House has not delegated its authority to grant press credentials to a private body; it retains and exercised final decision-making authority. The House simply consults a journalists' association, a commonplace practice repeatedly upheld as reasonable in administering press access to nonpublic government spaces.

Plaintiffs cannot demonstrate a likelihood of success on the merits or satisfy any of the other requirements for preliminary injunctive relief.

## II.   FACTS

The Legislature meets annually to make Washington law.[1]  During the session, elected House Members convene in the House chamber to debate, amend, and vote on legislation. Dean Decl. ¶3. The House chamber is an assembly room consisting of the House floor, wings, caucus rooms, and public galleries overlooking the floor from which visitors may watch floor activity. *Id.* ¶¶3-4 & Ex. A.



---

[1] https://leg.wa.gov/about-the-legislature/house-of-representatives/ (last visited Mar. 4, 2026).

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 2
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

Dean Decl. ¶9.

The floor is where Members work during floor sessions. *Id.* ¶4. It is a space "that is not open to the public and not held on government property dedicated to open communication" by the public. *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021). Centered at the front is the rostrum where the Speaker of the House presides. Dean Decl. ¶4. Facing the rostrum are rows of desks, one for each Member. *Id.* These are Members' workspaces. *Id.* Flanking each side of the floor are the wings from which Members can access their party's caucus room and party leadership offices, and from which invited guests and credentialled press can view floor activity. *Id.* On the floor are two tables available to credentialed journalists on a first come, first served basis.



*Id.* ¶9.

The public, including advocates for or against legislation and any member of the press, may view floor sessions from the gallery. *Id.* ¶¶3, 9. Access to the floor and wings, however, is

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 3
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1  limited by House Rule 8, adopted pursuant to the Washington Constitution. *Id.* ¶6.[2]  Under Rule

2  8, "[o]nly members of the house, pages, sergeants at arms, the speaker's attorney, the leadership

3  counsel to the minority caucus, and clerks are permitted on the floor while the house is in session."

4  The Rule limits access "to the wings and adjacent areas of the house chamber" during House floor

5  sessions to the governor, senators, state elected officials, officers and authorized employees of the

6  Legislature, "[f]ormer members of the house who are not advocating any pending or proposed

7  legislation," representatives of the press, and "[o]ther persons with the consent of the speaker."

8  Journalists are permitted in the wings or at press tables during floor sessions only with a press

9  pass. *Id.* ¶9.

10  **A.    House Floor Press Access**

11        To request a floor press pass, an individual must fill out the Floor Press Pass Request

12  Form.[3]  It explains, among other information:

13                    [The] House will issue floor press passes to individuals that meet the
14                    Capitol Correspondents Association (CCA) guidelines, informed by
                    CCA recommendations.  Guidelines are available upon request.  In
15                    addition, like all visitors to the House chamber, the individual must
                    abide by the House Rules of decorum, the Legislative Code of
16                    Conduct, and the House guidelines below.[4]

17  The applicant must provide, *inter alia*, the press organization they represent and the type of pass

18  requested.[5]

19        There are two types of floor press passes: "daily" and "hard" passes.[6]  Most passes issued

20  are daily, which give access for a specific day.[7]  Applicants may request up to five daily passes at

21

22

23  [2] https://leg.wa.gov/about-the-legislature/legislative-procedures/house-rules/?chapter=0a493781-325f-4f28-9d79-570102b4559c#book (last visited Mar. 4, 2026).

24  [3] https://form.jotform.com/253207367883061 (last visited Mar. 4, 2026).

    [4] *Id.*

25  [5] *Id.*

    [6] *Id.*

26  [7] *Id.*

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 4
[3:26-cv-5214-DGE]

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

once.[8]  In limited circumstances, a journalist may qualify for a hard pass, which covers the duration of the legislative session.[9]  Daily and hard passes provide access to the same physical space and are issued using the same criteria—set forth in the Guidelines—the difference in eligibility is simply that hard passes are available only to those whose primary assignment is the capitol campus and are onsite often.  Palmer Decl. ¶8.

**B.    CCA Guidelines**

As the application explains, the House issues press passes based on the Guidelines.  They provide that (1) credentials may be issued only to professional journalists, meaning it is their primary job, (2) a "credential-seeker's employer must be a news organization," meaning the "entity must be doing news for the sake of news alone," and (3) credentials should not be issued to a person "who is or may become engaged in campaigns, lobbying, or the development of public policy" or who does "any sort of consulting, advising, writing, or other work, whether paid or unpaid, for a politician, public official, party organization, lobbying shop, etc."  ECF #2, Attach. 1 ("Maynard Decl."), Ex. C.

These criteria are guided by the principle that House floor access should be given to press who are independent observers and monitors, not participants with a stake in the proceedings, no matter their political viewpoints.  *Id.* ("This is the spirit in which the Legislature has offered access: The press should act as an independent observer and monitor of the proceedings, not an involved party.") As the Guidelines explain, "The press must be independent from the government and from the political parties, their constituent groups, and the many organizations which have a stake in the Legislature's proceedings.  Blurring that line would raise questions about the motives of everyone in the press corps…."  *Id.*  The Guidelines acknowledge that journalists may cross "back and forth between being a journalist and being involved in political work."  *Id.*  Thus, the House assesses "the credential-seeker's current or potential political involvement…each year –

---

[8] *Id.*

[9] *Id.*

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1  meaning that someone might qualify for a press credential one year, but not the following,

2  depending on their outside activities." *Id.*; Palmer Decl. ¶17.

3       The Guidelines are consistent with those used by other legislative bodies, including

4  Congress.  Palmer Decl. ¶6 & Exs. B, C.[10]

5  **C.    Plaintiffs' Ineligibility**

6       This lawsuit arises from the House's denial of daily press passes in 2026 to Plaintiffs, who,

7  among others, were denied passes because they did not meet the Guidelines.  Palmer Decl. ¶33.[11]

8       **1.    Ari Hoffman**

9       Hoffman is a talk radio host for 570 KVI.  He also is involved with Let's Go Washington,

10  a political action committee that campaigns for initiatives, including two this legislative session.

11  Dean Decl. ¶19; Palmer Decl. ¶22.[12]  He was the guest speaker at a Let's Go Washington "Super

12  Signer Rally" in November 2025, supporting these initiatives.  Dean Decl. ¶19.



23  ---

   [10] *See, e.g.,* https://periodical.house.gov/accreditation/application-process (last visited Mar. 4, 2026);
https://www.ncsl.org/legislative-staff/lincs/media-access-and-credentialing (last visited Mar. 4, 2026);
https://www.ccac.us/ (last visited Mar. 4, 2026); https://content.leg.colorado.gov/agencies/senate/press-credentials
(last visited Mar. 4, 2026).

   [11] "Left-leaning organizations such as the Northwest Progressive Institute have so far chosen not to apply for
credentials, expecting they would be denied **because they advocate for legislation**."
https://www.kuow.org/stories/is-right-wing-media-allowed-in-olympia (last visited Mar. 4, 2026) (emphasis added).

   [12] https://letsgowashington.com/ (last visited Mar. 4, 2026).

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 6
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1    On January 26, 2026, Hoffman requested a *daily* press pass for January 29.  Dean Decl.,

2    Ex. H; Mot. at 12:2-3.  The House denied his request and told him how to appeal.  Dean Decl.,

3    Ex. I.  Hoffman appealed:

4            It will be Jewish advocacy day and I will be there anyway.  I was
         hoping for a media pass but was denied without being told the
5            reason for the decision.  Could you please tell me the basis for this
         decision, or approve a media pass for me for this Thursday.
6

7    *Id.*  On January 28, the House denied his appeal and explained:

8            The House, in part, looks to the Capitol Correspondents'
         Association (CCA) to make recommendations regarding whether a
9            press pass applicant is a bona fide journalist or not.  Based on your
         recent engagement in public policy development and advocacy, your
10           request for a House Press pass is denied.  This decision was made
         irrespective of your broadcast work.
11

12           As stated in the CCA guidelines: "It is important that a line be
         established between professional journalism and political or policy
13           work.  This is the spirit in which the Legislature offered access: The
         press should act as an independent observer and monitor of the
14           proceedings, not an involved party."

15           That said, they also state: "In some cases, professional journalists
         have crossed back and forth between being a journalist and being
16           involved in political work.  Some even have run for office.  Since
         credentials must be renewed with each legislative session, an
17           assessment of a credential-seeker's current or potential political
         involvement will be undertaken each year – meaning that someone
18           might qualify for a press credential one year, but not the following,
         depending on their outside activities."
19

20           Also, please note that a press pass does not impact your ability to
         participate in Jewish advocacy day.  The press pass provides you
21           with access to the House chamber wings during floor activity, which
         is otherwise viewable from the House galleries and TVW.  Jewish
22           advocacy day is not a House sponsored event, and there are no
         scheduled activities in House spaces, including the wings.
23

24           Absent additional information, the decision to not issue a press pass
         is upheld.  If you have anything else you would like me to consider,
25           please provide it to me.  I understand you applied for a pass for
         tomorrow, January 29, on Monday, January 26.  In the future, it is
26

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 7
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

recommended to apply for a daily press pass no later than two weeks prior to when you seek access. Nonetheless, I will endeavor to review any information you provide and get back to you with a timely response.

*Id.*; Maynard Decl., Ex. E. Hoffman responded: "The Seattle Times and other outlets endorse candidates, levys [sic] and initiatives[.] That would fit your definition of policy work[.] Plus they run ads for candidates[.] Why are they allowed to get press passes and I am not[?]" Dean Decl., Ex. J. The House promptly responded: "[W]e have no knowledge of anyone on Seattle's [sic] editorial board ever obtaining a House press pass. Press passes are issued per person not per organization." *Id.*

Hoffman's application was not denied based on the political leanings of his news organization. Indeed, the House provided a press pass to his 570 KVI colleague. Palmer Decl. ¶¶23, 34 & Ex. J.

Despite being denied a press pass, Hoffman accessed the House floor wing on January 29—the day for which he requested a daily pass—by invitation of a Member. Dean Decl. ¶21.

## 2. Brandi Kruse

Kruse is the host of a podcast called "unDivided with Brandi Kruse" with the tagline, "Political commentary for the anti-fringe."[13] She is an "Ambassador"[14] of Future 42, an organization with the stated purpose to "change the course of Washington state to prioritize policies that will allow our citizens, entrepreneurs and businesses to thrive and prosper."[15] Its mission is, in part, to "provide a means for citizens to make their voices heard and their actions count by respectfully communicating with lawmakers."[16]

---

[13] https://podcasts.apple.com/us/podcast/undivided-with-brandi-kruse/id1596795035 (last visited Mar. 4, 2026).
[14] https://future42.org/people/brandi-kruse/ (last visited Mar. 4, 2026).
[15] https://future42.org/about/ (last visited Mar. 4, 2026).
[16] *Id.*

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 8
[3:26-cv-5214-DGE]

Kruse also is involved with Let's Go Washington.[17]  The following screenshot from an unDivided YouTube video[18] shows Kruse speaking in support of the organization's initiatives on the steps of the Legislative Building on February 3, 2026:



She also spoke at a Let's Go Washington rally in November 2025.  Palmer Decl. ¶29 & Exs. E, G; Dean Decl. ¶16.

On February 2, 2026, the day before she appeared at the above-pictured rally, she applied for *daily* press passes for February 2 and 6 as a representative of unDivided.  Dean Decl., Ex. F. The House denied her request that day with instructions for appealing.  *Id.*, Ex. G.  She appealed. *Id.*

On February 4, the House denied Kruse's appeal, explaining:

> The House, in part, looks to the Capitol Correspondents' Association (CCA) to make recommendations regarding whether a press pass applicant is a bona fide journalist or not.  Based on your recent engagement in public policy development and advocacy, your request for a House floor press pass was denied….

---

[17] https://letsgowashington.com/ (last visited Mar. 4, 2026).
[18] https://www.youtube.com/watch?v=Du6zOZ7T4Vo (last visited Mar. 4, 2026).

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 9
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

> Absent additional information, the decision to not issue a press pass
> is upheld.  If you have anything else you would like me to consider,
> please provide it to me.  I will endeavor to review any information
> you provide and get back to you with a timely response.

Maynard Decl., Ex. J.  Kruse responded:

> The letter states I have worked on public policy development.  I
> have not worked on public policy development.  Can you provide
> precise information? In regard to advocacy, does this mean any
> individual who has taken a position on policy may not be granted a
> press pass? The Seattle Times editorial board?

Dean Decl., Ex. G.  Kruse falsely claimed in her declaration that she "received no response" to

this email.  ECF #2, Attach. 4, ¶¶10-11.  But the House responded February 5:

> The House has no knowledge of anyone who is part of an editorial
> board being granted a floor press pass, including those from the
> Seattle Times.  While the House floor press pass does not address
> any events beyond House Chamber access during House floor
> sessions, the House also has no knowledge of you being denied
> access to pressers or media avails.

*Id.*  On February 6, Kruse replied: "The Tuesday pass I requested was so I could attend a press

avail.  If you're [t]elling me that House Dems will still let me attend press conferences on their

side of the wings, then I need a press pass to enter."  *Id.*  She also requested "clarification on what

'public policy development' I have engaged in, specifically."  *Id.*  The Chief Clerk responded that

day:

> As noted previously, the House floor press pass is specifically
> related to House floor sessions in the chamber, which are completely
> independent from media avails.  You do not need a House floor
> press pass to attend a press conference.

> You specifically referenced a presser that occurred on Tuesday,
> February 3rd, which was not a day the House had a floor session.
> Furthermore, that presser was held in the **Senate Rules Room**,
> which is controlled by the Lt. Governor and the Senate.  Any
> questions about accessing those spaces should be directed to the
> Office of the Lt. Governor or the Senate.  To my knowledge, House
> Democrats have not been holding media avails in the HDC Caucus
> Room.  If for some reason the House Democrats have a press

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 10
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1

2

conference in their caucus room, you can always reach out to their caucus communications staff to get access.

3

Press credentials are not issued to individuals who actively engage in campaigns, lobbying, or advocate for candidates for public office and/or bills and ballot measures.

4

5

*Id.* Kruse sought, and the House provided, additional clarification about where other press events are held. *Id.*

6

### 3. Jonathan Choe

7

On February 2, 2026, Choe applied for *daily* press passes for February 2-6 as a

8

representative of "Discovery Institute/Frontlines TPUSA." Dean Decl., Ex. D. Discovery

9

Institute is a "[p]ublic policy think tank advancing a culture of purpose, creativity, and

10

innovation."[19] TPUSA (Turning Point USA) says its "mission is to identify, educate, train, and

11

organize students to promote the principles of fiscal responsibility, free markets, and limited

12

government."[20] Choe did not list any other organization in his application. Dean Decl., Ex. D.

13

The House denied Choe's request on February 2 and instructed him how to appeal.

14

Maynard Decl., Ex. H. He responded: "[W]hat is the reason for this denial?" *Id.* The House

15

explained to him that day: "Approvals and denials are based on Capitol Correspondence

16

Association's recommendations and may be appealed by contacting the Chief Clerk's Office in

17

writing." *Id.*

18

Choe responded the next day that his request was "time sensitive" because "I need to

19

attend a presser on Tuesday." *Id.* The House responded within 30 minutes, explaining he did not

20

need a press pass to attend a presser: "The House floor press pass is specific to floor proceedings

21

in the chamber. There are no floor proceedings today in the House, other than a pro forma

22

session. The House floor press pass does not have anything to do with pressers. Press

23

conferences are handled by the caucuses."[21] Dean Decl., Ex. E.

24

25

[19] https://www.discovery.org/about/ (last visited Mar. 4, 2026).

26

[20] https://tpusa.com/ (last visited Mar. 4, 2026).

[21] "Pro forma" sessions address routine procedural matters that may take less than a minute. Dean Decl. ¶14.

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 11
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1    On February 4, the House denied Choe's appeal:

2            The House, in part, looks to the Capitol Correspondents'
         Association (CCA) to make recommendations regarding whether a
3        press pass applicant is a bona fide journalist or not.  You indicated
         that you represent the Discovery Institute/Frontlines TPUSA.
4

5            As stated in the CCA guidelines, credentials are not provided to
         individuals who work for any publication or information source that
6        is part of a larger non-news organization; this includes think tanks.

7            Absent additional information, the decision to not issue a press pass
         is upheld.  If you have anything else you would like me to consider,
8        please provide it to me.  I will endeavor to review any information
         you provide and get back to you with a timely response.
9

10   Maynard Decl., Ex. I.

11           In response, Choe stated he also did freelance work for the *Lynnwood Times*.  He wrote: "I

12   did not include this outlet in my credential request this first time around because I did not think it

13   was necessary.  But if this changes the equation, I'd be happy to apply again under Lynnwood

14   Times."  *Id.*, Ex. H.  The Chief Clerk responded:

15           Please be specific in terms of which organization you are
         representing when you are attempting to access the House chamber.
16       If you are visiting on behalf of the Lynwood [sic] Times, you should
         include that information in a new application for a House floor press
17       pass.

18           I can't speak to your point about House Democrats or Senate
19       Democrats and their "access".  As noted in prior communication, the
         House press pass is specific to House floor sessions, it does not
20       address access to press conferences held by the partisan caucuses or
         anything beyond House floor sessions.
21

22   *Id.*  Choe responded: "[S]hould I reapply under Lynnwood Times?"  *Id.*  The Chief Clerk

23   responded: "I would suggest that you should apply under the news outlet you are representing."

24   *Id.*  Choe did not reapply.  Dean Decl. ¶15.

25

26

### III.   ARGUMENT

**A.    Plaintiffs must, but cannot, satisfy a stringent standard.**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A mandatory injunction "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Andersen v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (quotations & citation omitted).  Generally, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]" *Id.* at 1115 (quotations & citation omitted).

To justify a TRO or a preliminary injunction, Plaintiffs must establish that: 1) they are likely to succeed on the merits, 2) they are likely to suffer irreparable harm without preliminary relief, 3) the balance of equities tips in their favor, and 4) an injunction is in the public interest. *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025).  When the government is a party, these last two factors merge.  *Id.*  Plaintiffs have not, and cannot, justify this extraordinary remedy.

**B.    Plaintiffs' claims are <u>not</u> likely to succeed.**

Likelihood of success on the merits "is the most important" factor.  *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015) (*en banc*).  "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three" elements.  *Id.* (quotations omitted).  Where the moving party offers only a conclusory argument without evidentiary support, it fails to meet its burden to demonstrate success on the merits.  *Plintron Techs. USA LLC v. Phillips*, No. C24-93, 2024 WL 553718, at *3 (W.D. Wash. Feb. 12, 2024).

Plaintiffs fail to satisfy this determinative threshold inquiry.

**1.    Plaintiffs' First Amendment claim is meritless.**

"[A]llegations of suppression of the media must be sufficiently alleged to withstand" dismissal.  *MacIver*, 994 F.3d at 605.  "[S]tates can subject the press to generally applicable

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 13
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

regulations without offending the First Amendment." *Id.* at 613. Plaintiffs' empty allegations and hyperbole do not even cross the threshold of viability.

### a. The House Floor is a nonpublic forum.

"[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972); *accord TGP Commns., LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *4 (9th Cir. Dec. 5, 2022) ("The First Amendment does not provide a right of free and unconditional access to all government properties or events.") (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985)); *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001) (there is no First Amendment right of press access to public university where other members of the press receive access).[22] The Ninth Circuit reaffirmed that "[t]he government, like a private owner of property, can reserve its property to be used for the purposes for which it meant the property to be used." *Jacobsen v. U.S. Postal Serv.*, 812 F.2d 1151, 1152-53 (9th Cir. 1987). Hence, "[m]embers of the press are routinely excluded from places that other members of the public may not access such as … the meetings of other official bodies gathered in executive session[.]" *MacIver*, 994 F.3d at 612. The House "could, consistent with the First Amendment, exclude press from" the House floor "entirely." *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *6 (D.C. Cir. June 6, 2025).

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). To determine the extent of any First Amendment protection, the Court must first identify the relevant government space. Government property may be one of "three types of fora: the traditional public forum,"

---

[22] Plaintiffs try to sidestep this bedrock constitutional law by misleadingly quoting from *Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012). Here is their quotation of *Leigh* with the words Plaintiffs omitted added in bold: there is a "'**qualified** right of access for the press **and public** to observe government activities.'" Mot. at 16:3-4 (misquoting *Leigh*, 677 F.3d at 898) (emphasis added).

such as streets, sidewalks, and parks, "the public forum created by government designation," known as a limited public forum, "and the nonpublic forum." *Cornelius*, 473 U.S. at 802.

The House permits credentialed journalists to access limited space on and near the House floor. Dean Decl. ¶9. This area is a nonpublic forum. *Ateba v. Leavitt*, 133 F.4th 114, 121 (D.C. Cir. 2025) (White House press area is a nonpublic forum), *cert. denied*, No. 25-338, 2025 WL 3260204 (U.S. Nov. 24, 2025); *MacIver*, 994 F.3d at 609 (governor's press briefings occur in a nonpublic forum). A nonpublic forum is government property that "is not by tradition or designation a forum for public communication," such as a government office building. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). Although the government is not required to open such spaces for public speech at all, the government creates a nonpublic forum when it provides "selective access for individual speakers." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998).

As a nonpublic forum,[23] access to the House floor "can be restricted as long as the restrictions are" reasonable and viewpoint neutral. *Cornelius*, 473 U.S. at 800; *accord Ateba*, 133 F.4th at 123 ("'Control over access to a nonpublic forum can be based' even 'on subject matter and speaker identity so long as' it meets the requirements of reasonableness and viewpoint neutrality.") (quoting *Cornelius*, 473 U.S. at 806); *MacIver*, 994 F.3d at 610 (governor's press conference was a nonpublic forum "to which the government may regulate access provided the regulations are reasonable and" not based on viewpoint). The purpose of the forum is central to this analysis because the government may "reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. "Control over access to a nonpublic forum can be based on subject matter

---

[23] Plaintiffs agree that the House floor is a "nonpublic forum." Mot. at 17:17. But they mistakenly cite to *Jacobsen* for the proposition that the loss "of access to a **public forum** is, each day, an irreparable injury." *Id.* at 16:6-10 (quoting *Jacobsen*, 812 F.2d at 1154) (emphasis added).

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TRO AND PRELIMINARY INJUNCTION - 15 [3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806.

Speech restrictions in a nonpublic forum need satisfy only this "limited review." *United States v. Nassif*, 97 F.4th 968, 978 (D.C. Cir.), *cert. denied*, 145 S. Ct. 552 (2024). The restrictions imposed by the Press Policy easily pass constitutional muster. *Ateba*, 133 F.4th at 127 ("[T]he White House's reliance on an outside credentialing body is both reasonable and viewpoint neutral.").

### b.    The Press Policy is reasonable.

To be reasonable, a restriction "need not be the most reasonable or the only reasonable" restriction. *Cornelius*, 473 U.S. at 808. "Nor does it mean that" a court "must disallow a government's set of viewpoint-neutral criteria simply because" the court "can imagine a superior system of allocation." *MacIver*, 994 F.3d at 615. The Supreme Court gives the government substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified considering the forum's purpose. *See, e.g.*, *Forbes*, 523 U.S. at 682 (reasonable for public television broadcaster to exclude independent political candidate from candidate debate because he had "generated no appreciable public interest"); *Cornelius*, 473 U.S. at 808-09 (reasonable to exclude certain legal defense and political advocacy organizations from charity drive because donations to other charity causes were "more beneficial" and better served the purpose of the charity drive).

The type of press access rules employed by the House repeatedly have been held to be reasonable. For example, the Seventh Circuit upheld a governor's restrictions of access to journalists who are "bona fide correspondent[s] of repute in their profession," "avoid real or perceived conflicts of interest," "are free of associations that would compromise journalistic integrity or damage credibility," and refrain from "any lobbying, paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation or organization." *MacIver*, 994 F.3d at 606. The Court ruled these criteria "are reasonably related to the viewpoint-

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 16
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." *Id.* at 610.

Last year, the D.C. Circuit in *Ateba* approved as reasonable the White House's reliance on credentialing decisions by a "committee[] of journalists that evaluate the qualifications of reporters who seek to enter nonpublic areas" of the White House "to cover the work of the government." 133 F.4th at 123. "It is surely reasonable for the White House to open the Press Area only to bona fide journalists and to" use "its long-established practice of" vetting by the journalists' association "as a measure of a reporter's professional standing." *Id.* "[I]t is reasonable to allow established members of the profession to make the credentialing decision." *Id.* at 123. The House does not go nearly as far as the White House; the House, itself, applies the Press Policy to applicants, with only guidance from the CCA. Dean Decl. ¶11.

The D.C. Circuit held that it had "no basis to question such discretionary policies that reasonably limit access to a nonpublic forum, consistent with its purpose." *Ateba*, 133 F.4th at 123. Here, the purpose of the nonpublic forum is for the House to debate and pass laws without interruption or lobbying in that space. Dean Decl. ¶¶3-6. The Press Policy reasonably limits access to the House floor consistent with these purposes. *Nassif*, 97 F.4th at 979 ("Like any occupant of a government office building, Congress must be free to restrict at least some expressive activity to preserve its buildings as a functional workplace.").

Plaintiffs say the Press Policy is unreasonable for four reasons, none of which has merit. First, they say the Guidelines "are unpublished, vague, ambiguous, and unenforceable." Mot. at 18:3. But they **are** published and available to anyone, as evidenced by Plaintiffs' ability to obtain them. *Id.* at 10:1-3; Maynard Decl., Ex. C. Moreover, while Plaintiffs disagree with the Press Policy, they have not said **how** it is "vague" or "ambiguous." They were denied press passes because they applied on behalf of entities that are not "doing news for the sake of news alone" (Choe) or because they are currently "engaged in campaigns, lobbying, or the development of

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 17
[3:26-cv-5214-DGE]

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

public policy" (Huffman and Kruse).  Maynard Decl., Ex. C.  They **are not** "independent

observer[s] and monitor[]s of the proceedings"; they **are** "involved part[ies]."  *Id.*  There is no

unbridled discretion here.  *Ateba*, 133 F.4th at 126 (policy requiring that credentialed

correspondents work full-time for a news organization and not engage in lobbying "provide[s]

concrete guidelines that cabin the Standing Committee's discretion").

Second, Plaintiffs say the Press Policy is not reasonable because it is "not applied

uniformly or even consistently."  Mot. at 18:4.  In support of this argument, they offer nothing.

They point to "members of the press" who "routinely testify on pending legislation[.]"  *Id.* at

11:11.  But they identified no member of the press who routinely testifies on pending legislation

who has been provided a pass.  Indeed, none has.  Palmer Decl. ¶34.  And they point to the

"editorial pages" of newspapers "which endorse political candidates and advocate for or against

specific policies."  Mot. 11:17-18.  But they identified no editorial writer who has been provided a

pass.  That is because editorial writers do not receive press passes from the House.  Palmer Decl.

¶18.  Contrary to Plaintiffs' bald accusations, the House consistently applies its Press Policy.

Palmer Decl. ¶¶4, 21.

Third, Plaintiffs claim the Press Policy is not reasonable because of "[t]he lack of due

process of standards of review for appeals, or facts or law that would be considered by the Clerk in

an appeal[.]"  Mot. at 18:6.  This too is supported by nothing.  The House promptly reviewed

Plaintiffs' appeals of their pass denials, explained exactly how and why Plaintiffs failed to satisfy

the Press Policy, and immediately answered their questions.  Dean Decl. ¶¶13-16, 18-20, 22 &

Exs. E, G, I, J.  In any event, "processing deadlines" are not "constitutionally required in the

context of a content-neutral licensing scheme."  *Ateba*, 133 F.4th at 126.  The Press Policy "is the

type of 'traditional' exercise of government authority that does not trigger heightened procedural

protections."  *Id.* at 127.

Fourth, Plaintiffs say "[a] 'day pass' is not an adequate substitute for full credentials."

Mot. at 18:8.  These two passes provide identical access to the House floor based on the frequency

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 18
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1    of the journalist's need.  Palmer Decl. ¶¶8, 10.  And Plaintiffs **did not** apply for "full credentials,"

2    they applied only for daily passes.  Dean Decl., Exs. D, F, H.

3              **c.**      **The Press Policy is viewpoint neutral.**

4          Viewpoint discrimination is an "egregious form of content discrimination" that occurs

5    when a government regulation "targets not subject matter, but particular views taken by speakers

6    on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  "In

7    evaluating claims of viewpoint discrimination, '[w]e thus look to the government's purpose as the

8    threshold consideration.'" *TGP Commns.*, 2022 WL 17484331 at *4 (quoting *Madsen v. Women's*

9    *Health Ctr.*, 512 U.S. 753, 763 (1994)).  The House's purpose and the effect of its policy, as with

10    other such policies that have passed constitutional challenge, is "increasing journalistic integrity

11    by favoring media that avoid real or perceived conflicts of interest or entanglement with special

12    interest groups, or those that engage in advocacy or lobbying." *MacIver*, 994 F.3d at 610.  As the

13    Seventh Circuit held with respect to press access criteria just like the ones at issue here, "[t]here is

14    nothing inherently viewpoint-based about these criteria, and [the plaintiff] has not provided any

15    evidence that the Governor's office manipulates these neutral criteria in a manner that

16    discriminates against conservative media." *Id.* at 611.

17          As with the policy for accessing the White House approved by the D.C. Circuit, the Press

18    Policy "does not reference viewpoints in any way" in language or application.  *Ateba*, 133 F.4th at

19    124; *accord Utah Policy Watch, Inc. v. Musselman*, No. 2:25-cv-00050-RJS, 2025 WL 2772470,

20    *5 (D. Utah Sep. 29, 2025) (Utah legislature press access policy exclusion of "blogs, independent

21    media or other freelance media" was not impermissible content and viewpoint discrimination),

22    *appeal docketed*, No. 25-4124 (10th Cir. Sep. 30, 2025).  The House does not deny press

23    credentials based on the content of a correspondent's reporting.  Palmer Decl. ¶21; Maynard Decl.,

24    Ex. C.  To the contrary, the journalists who are credentialed under the Press Policy represent news

25    organizations with a broad and divergent range of editorial views.  Palmer Decl. ¶24.  What they

26    have in common is that they are full-time journalists who are not directly involved in lobbying and

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 19
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

policy debates.  Maynard Decl., Ex. C; Palmer Decl. ¶¶13, 19.  Plaintiffs' contention that the

"effect" of the Press Policy is "suppressing opposing viewpoints because" they are actively

engaged in politics, Mot. at 18:9, is supported by nothing and flies in the face of the diverse

journalists who satisfy the Policy's requirements.  Palmer Decl. ¶¶23-24.  The D.C. Circuit last

year approved precisely such a policy, requiring "that credentialed correspondents work full-time

for a news organization" and "not engage in lobbying."  *Ateba*, 133 F.4th at 125.

Plaintiffs' bald assertions do not suffice.  The Seventh Circuit explained why:

> MacIver asserts that it viewed the media advisory list as
> confirmation that its exclusion was ideologically motivated, but **it
> offers no support or explanation for that factual assertion**.  In
> fact, the list includes media outlets traditionally viewed as
> conservative leaning such as the Washington Times, Wall Street
> Journal, Fox News, and Washington Examiner, as well as those
> viewed as liberal leaning such as the Capitol Times, New York
> Times, and Huffington Post….  [T]he inclusion of a broad range of
> media outlets on both sides of the political spectrum certainly
> diminishes any claim that the list is based on political ideology.

*MacIver*, 994 F.3d at 611 (emphasis added).  The same is true here.  As in *MacIver*, Plaintiffs have

not provided "factual support in the record demonstrating that the" House "discriminated against

[Plaintiffs] on the basis of [their] viewpoint[s], rather than the stated reason that their practices ran

afoul of the neutral factors."  994 F.3d at 611 (quotations & citation omitted).  "[N]aked assertions

of bias" that are "unsupported by references to the record" do not suffice.  *Id.*

*TGP Communications*, to which Plaintiffs point, offers them no aid.  The Ninth Circuit's

*per curiam* order with respect to an injunction pending appeal is wholly distinguishable.  In that

case, a journalist was denied a pass to a facility where ballots were being counted.  The Court

found that, despite the government's stated reasons for denying the pass, "the evidence" offered by

both parties "strongly suggests that a predominant reason for the County denying Plaintiffs a press

pass was Conradson's political views."  2022 WL 17484331 at *4-*5.  The Court emphasized that

> **[t]he County's own witness** … stated at the **evidentiary hearing**
> that, beyond not avoiding conflicts of interest, Conradson's press

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

> pass was denied because "[h]e doesn't seek the truth and his articles
> have led to direct threats to Board of Election officials and
> employees." Permitting "truth" to be determined by the County
> violates our foundational notions of a free press.

*Id.* (emphasis added). "The County's own evidence only underscores that the press-pass denial, as applied to Conradson, was not viewpoint neutral; the County's evidence indeed highlights its reliance on Conradson's political views." *Id.* The Ninth Circuit readily distinguished *TGP Communications* from the ruling in *MacIver* where the Seventh Circuit "noted that there was no evidence that the government had 'manipulate[d] the[] neutral criteria in a manner that discriminate[d]' against the applicant." *Id.* (quoting *MacIver*, 994 F.3d at 611).

Plaintiffs' First Amendment challenge fails.

### 2.    Plaintiffs' Art. I, section 5 claim is meritless.

Plaintiffs' press right claim under the Washington Constitution is unlikely to succeed for the same reasons. As the Washington Supreme Court has explained, "[w]e apply the same standard under article I, section 5 for speech in a nonpublic forum as is applied under the First Amendment. Speech in nonpublic forums may be restricted if the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Sanders v. City of Seattle*, 156 P.3d 874, 880 (Wash. 2007) (internal citation and quotations omitted). While Plaintiffs cite the general proposition that the Washington free speech provision affords greater protection than its federal counterpart, Mot. at 18, there are no "greater" protections in this context. *World Wide Video of Wash., Inc. v. City of Spokane*, 103 P.3d 1265, 1272 (Wash. Ct. App. 2005) ("Speech in a *non*public forum, however, is not entitled to greater protection under article I, section 5.").

Indeed, none of the three cases Plaintiffs cite is relevant. At issue in *State v. Noah*, 9 P.3d 858 (Wash. Ct. App. 2000), *as amended on reconsideration* (Oct. 30, 2000), was whether an antiharassment order and contempt conviction violated the defendant's free speech rights (they did not) and whether judicial enforcement of a settlement agreement involved "state action" as

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

required to establish an article I, section 5 violation (it did not).  *Id.* at 865-66, 870-71.  *Adams v. Hinkle*, 322 P.2d 844 (1958), involved a challenge to a statute from the 1950s that restricted the sale of comic books on the theory they were "a factor in juvenile delinquency."  *Id.* at 847.  And Plaintiffs quote a headnote, not the opinion.  Mot at 18.  In *State v. Coe*, 679 P.2d 353 (Wash. 1984), the Court reversed a contempt conviction where the "trial court held a radio and television station in contempt for violating a court order prohibiting the broadcast of accurate, lawfully obtained copies of tape recordings that had been played in open court."  None of this authority supports an independent state constitutional claim here.

### 3.  Plaintiffs' Due Process claims are meritless.

Plaintiffs contend that the denial of their press passes violated their right to due process under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 3 of the Washington Constitution.  This is so, they assert, because the Press Policy is "inadequate, vague and ambiguous and inconsistently enforced" and because the decision to deny them press passes was "arbitrary and wholly uncompelling."  Mot. at 20.  Their arguments are without merit.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).[24]  The interest of a bona fide journalist in obtaining a press pass may be a protected liberty interest which may not be denied without due process.  *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977). The due process required in such circumstances is fulfilled if the government relies on "some criteria to guide its determinations" and has "a reasonable way of assessing whether the criteria are met."  *Getty Images News Servs. Corp. v. Dept. of Defense*, 193 F. Supp. 2d 112, 121 (D.D.C. 2002).  Where an applicant does not meet the criteria, the government must provide "notice to the

---

[24] Plaintiffs do not argue that the state constitution provides greater protections than the federal constitution. *See* Mot. at 20 (citing *State v. Beaver*, 336 P.3d 654, 658 n.14 (Wash. Ct. App. 2014) (analyzing due process claim solely under the U.S. Constitution because "Washington's due process clause does not afford broader protection that given by the Fourteenth Amendment to the United States Constitution."), *aff'd*, 358 P.3d 385 (2015).

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 22
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

unsuccessful applicant of the factual bases for denial with an opportunity to rebut." *Sherrill*, 569 F.2d at 131.

As discussed *supra*, §II.A-B, the Press Policy is memorialized in writing and is available to anyone. The press pass application provides that eligibility also depends on compliance with the House Rules, House Guidelines, and Legislative Code of Conduct, all of which are publicly available. Palmer Decl. ¶4. Plaintiffs requested and received a copy of the Press Policy. Maynard Decl., Ex. C. Although Plaintiffs repeatedly assert that the Press Policy is "vague" and "ambiguous," they never identify which terms or parts of the policy they do not understand. A statute is unconstitutionally vague only if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

The Press Policy provides people of ordinary intelligence with a reasonable opportunity to understand eligibility criteria. It states that a "credential-seeker's employer must be a news organization, full stop." Maynard Decl., Ex. C. This explicitly excludes entities "founded, funded or affiliated with lobbyists, lobbyist firms or lobbying associations…" *Id.* Credentials will not be provided to "a person who is or may become engaged in campaigns, lobbying, or the development of public policy." *Id.* These are commonly understood terms and are well understood in context. *See Utah Political Watch*, 2025 WL 2772470 at *9 (concluding that the Utah Legislature's media credentialing policy was not unconstitutionally vague).

Plaintiffs each received notice of the factual bases for the denial of their press passes. Hoffman and Kruse were denied press passes "[b]ased on your recent engagement in public policy development and advocacy." Maynard Decl., Exs. E & J. None of this is vague.[25] Choe was denied a press pass because he applied for the pass as a representative of the Discovery

---

[25] Plaintiffs provide no authority—because there is none—supporting their assertion that due process required the House to list "examples" of their public policy advocacy. Mot. at 21:9-11.

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 23
[3:26-cv-5214-DGE]

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

Institute/Frontlines TPUSA, a self-described "[p]ublic policy think tank,"[26] and "credentials are not provided to individuals who work for any publication or information source that is part of a larger non-news organization; this includes think tanks." *Id.*, Ex. I.  He was offered an opportunity to reapply for a press pass in his capacity as a freelancer with the *Lynnwood Times*, but he elected not to do so.  Palmer Decl. ¶32.

Plaintiffs' assertion that they were not provided an opportunity to challenge their access denials is puzzling, and false.  Mot. at 21.  The House told Plaintiffs that "[i]f you wish to appeal this decision, you can contact the Chief Clerk's Office in writing stating the nature of the appeal." Maynard Decl., Ex. H.  Plaintiffs did, in fact, appeal these decisions by contacting the Chief Clerk's Office.  Dean Decl. ¶¶15, 18, 20.  Plaintiffs were provided with an opportunity to show that they satisfied the Press Policy, *Sherrill*, 569 F.2d at 131, but they could not.

Neither were Plaintiffs denied press passes for arbitrary or less than compelling reasons. The criteria in the Press Policy are guided by the principle that House floor press access should be given to press who are independent observers and monitors, not participants with a stake in the proceedings, no matter their political viewpoints.  Maynard Decl., Ex. C; *see supra*, §II.B. Plaintiffs' unsupported assertion that they are "to their knowledge, the only journalists so affected" does not render the decision to deny them press passes arbitrary.  The House this year has denied press passes to others who did not satisfy the Press Policy.  Palmer Decl. ¶33.  Finally, Plaintiffs were **not** denied press passes "based entirely on an impermissible regulation of the content and perceived viewpoints" of their speech.  Mot. at 22.  They offer no evidence whatsoever in support of this argument, which is also undermined by the stated reasons for the denials and the House's grant of press passes to Plaintiffs' colleagues who met the eligibility criteria.  Dean Decl. ¶20; Palmer Decl. ¶¶23, 32.

Plaintiffs were provided all the process they were due (and more).

---

[26] https://www.discovery.org/about/.

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 24
[3:26-cv-5214-DGE]

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

4.     **Plaintiffs' non-delegation claim is meritless.**

Plaintiffs are not likely to succeed on the merits of their non-delegation claim as they attack only a hypothetical, not even an alleged, delegation of legislative powers.

The non-delegation doctrine stems from article II, section 1 of the Washington Constitution, which provides: "The legislative authority of the state of Washington shall be vested in the legislature." Wash. Const. art. II, § 1. Under this provision, "it is unconstitutional for the Legislature to abdicate or transfer its legislative function to others." *Brower v. State*, 969 P.2d 42, 49 (Wash. 1998). However, the Legislature may delegate legislative powers to private parties "if proper standards, guidelines, and procedural safeguards exist." *Associated Gen. Contractors of Wash. v. State*, 518 P.3d 639, 644 (Wash. 2022) (quotations & citation omitted).

Plaintiffs do not allege there was a delegation of powers here. Mot. at 22 (arguing only that "[t]o the extent that the House of Representatives claims to delegate to the CCA, …"); Pet. ¶ 77 (same). There was none. The House has not delegated to the CCA authority to grant and deny press passes—that authority lies with the House, which denied Plaintiffs' requests for press passes here. Dean Decl. ¶11; Maynard Decl., Ex. C ("Issuing press credentials is subject to the direction and control of the administrations of the Senate and House."). The appeals process is likewise handled by the House, as happened here.[27]

No delegation was alleged (or occurred) that offends the Washington Constitution.

**C.     Plaintiffs are <u>not</u> likely to suffer irreparable harm.**

Even when there is a strong likelihood of success on the merits an injunction "cannot issue" "if there is just a mere possibility of irreparable harm." *McGary v. Inslee*, No. C23-5388 BHS, 2023 WL 5822280, at *3 (W.D. Wash. Sep. 8, 2023). "Speculative injury does not constitute irreparable injury sufficient to warrant" preliminary injunctive relief. *Caribbean*

---

[27] Even if there were a delegation of legislative powers (there is not), proper standards, guidelines, and procedural safeguards exist. The Guidelines are expressly rooted in the Legislature's prohibition on lobbying during floor sessions. And the appeals process safeguards against abuse of discretion or arbitrary action. Courts have found even more attenuated processes sufficient. *Auto. United Trades Org. v. State*, 357 P.3d 615, 624 (Wash. 2015) ("We have found sufficient safeguards exist because of administrative review and the availability of writs of certiorari, among other things.") (internal citations omitted).

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 25
[3:26-cv-5214-DGE]

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1    *Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Thus, an injunction should be

2    rejected where there is no evidence "to suggest, or for the Court to rely on, that irreparable injury

3    would occur if the Court does not issue" an injunction.  *Plintron Techs*., 2024 WL 553718 at *4.

4         Any harm Plaintiffs may suffer is not "irreparable."  Choe, for one, was offered an

5    opportunity to reapply for a press pass in his capacity as a freelancer with the *Lynnwood Times*,

6    but he elected not to do so.  Palmer Decl. ¶32.  Any harm he experienced was self-inflicted.

7    Moreover, as discussed above, the notion that Plaintiffs will suffer the loss of constitutional rights

8    is not just speculative, but baseless.  And it ends consideration for the requested injunction.  *Baird

9    v. Bonta*, 81 F4th 1036, 1041 (9th Cir. 2023) (If a plaintiff "alleges a constitutional violation," the

10   likelihood of success on the merits factor is "usually decisive.").

11   **D.    The equities <u>do not</u> favor Plaintiffs, and an injunction <u>would not</u> be in the public
         interest.**

12        In assessing these final factors, the Court "must balance the competing claims of injury and

13   must consider the effect on each party of the granting or withholding of the requested relief."

14   *Winter*, 555 U.S. at 24.  If it were appropriate to get this far in the analysis, the balance of equities

15   and the public interest would point only in the House's direction.  It has a substantial interest in

16   preserving the working space of Members on the House floor free of lobbyists.

17                                **IV.   CONCLUSION**

18        Defendants respectfully request that the Court deny Plaintiffs' motion.

19

20

21

22

23

24

25

26

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1    DATED this 6th day of March, 2026.

2                                              SUMMIT LAW GROUP, PLLC
                                               Attorneys for the Washington State House of
3                                              Representatives, Chief Clerk Bernard Dean, and
                                               the State of Washington
4

5                                              I CERTIFY THAT THIS MEMORANDUM CONTAINS
                                               8,400 WORDS, IN COMPLIANCE WITH THE LOCAL
6                                              CIVIL RULES.

7

8                                              By s/ Jessica L. Goldman
                                                  Jessica L. Goldman, WSBA #21856
9                                                 JessicaG@summitlaw.com
                                                  Eva S. Oliver, WSBA #57109
10                                                EvaO@summitlaw.com
                                                  Jesse L. Taylor, WSBA #51603
11                                                JesseT@summitlaw.com
                                                  315 Fifth Avenue S., Suite 1000
12                                                Seattle, WA 98104-2682
                                                  Tel: 206-676-7000
13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR TRO AND PRELIMINARY INJUNCTION - 27
[3:26-cv-5214-DGE]