# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| ARI HOFFMAN, BRANDI KRUSE, and JONATHAN CHOE, <br><br> *Plaintiffs*, <br><br> v. <br><br> WASHINGTON STATE HOUSE OF REPRESENTATIVES; CHIEF CLERK BERNARD DEAN, in his official capacity; THE LEGISLATURE OF THE STATE OF WASHINGTON; THE STATE OF WASHINGTON and the WASHINGTON STATE CAPITOL CORRESPONDENTS ASSOCIATION, <br><br> *Defendants*. | No. 3:26-cv-5214 <br><br> **PLAINTIFFS' REPLY BRIEF** <br><br> **NOTE ON MOTION CALENDAR: MARCH 9, 2026 - 1:30 PM** |

PLAINTIFFS' REPLY – i



**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................ ii
**INTRODUCTION** ................................................................................................................. 5
**ARGUMENT** ......................................................................................................................... 6
   **I.**   **DEFENDANTS' FILINGS CONFIRM THAT PLAINTIFFS WERE EXCLUDED BASED ON THEIR SPEECH AND VIEWPOINTS IN VIOLATION OF FREEDOM OF THE PRESS AND SPEECH** ..................................................................... 6
   **II.**   **THE HOUSE PRESS AREAS ARE AT LEAST A LIMITED PUBLIC FORUM** 9
   **III.**   **DEFENDANTS' CRITERIA VIOLATE DUE PROCESS PROTECTIONS** ....... 11
   **IV.**   **DEFENDANTS' SCHEME VIOLATES THE NONDELEGATION DOCTRINE** 14
   **V.**   **PLAINTIFFS ARE SUFFERING ONGOING IRREPARABLE HARM** ............. 15
   **VI.**   **THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF** .. 16
**CONCLUSION** .................................................................................................................... 16

## **TABLE OF AUTHORITIES**

**Cases**

*Alpha Delta Chi-Delta Ch. v. Reed,*
  648 F.3d 790 (9th Cir. 2011) .................................................................................. 2

*Children's Health Def. v. Meta Platforms Inc.*
  112 F.4th 742 (9th Cir. 2024) ............................................................................... 10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) ............................................................................................... 6

*Elrod v. Burns,*
  427 U.S. 347(1976) .............................................................................................. 11

*Entertainment Indus. Coal. v. Tacoma-Pierce Cnty. Health Dep't,*
  153 Wash.2d 657, 105 P.3d 985 (2005) ............................................................... 10

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
  994 F.3d 602 (7th Cir. 2021) .................................................................................. 4

*Karem v. Trump,*
  960 F.3d 656(D.D.C. 2020) ................................................................................ 1, 9

*Madsen v. Women's Health Ctr.,*
  512 U.S. 753(1994) ................................................................................................ 2

*Minn. Voters All. v. Mansky,*
  585 U.S. 1(2018) .................................................................................................... 5

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
  460 U.S. 37 (1983) ............................................................................................. 2, 5

*Pleasant Grove City, Utah v. Summum,*
  555 U.S. 460(2009) ................................................................................................ 5

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155(2015) ................................................................................................ 2

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819(1995) ................................................................................................ 5

*Sherrill v. Knight,*
  569 F.2d 124 (D.C. Cir. 1977) ............................................................... 4, 6, 9, 10

*TGP Comms., LLC v. Sellers,*
  2022 WL 17484331 (9th Cir. 2022). ............................................................. 1, 2, 3

*United States v. Nassif,*
   97 F.4th 968 (D.C. Cir. 2024) .................................................................................................. 5

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ................................................................................................................ 9

**INTRODUCTION**

Defendants' opposition confirms the central constitutional problem: the State of Washington has created a press credentialing regime that allows government officials—working with a private association—to decide which journalists are sufficiently "journalistic" to access the legislature's press areas. This regime excludes Plaintiffs not because of any neutral access limitation but because of their perceived advocacy and political viewpoints. The First Amendment does not permit the government to decide that certain journalists are too opinionated, too critical, or too politically active to qualify as members of the press. Yet that is precisely what Defendants admit they have done.

In an effort to justify this obviously unconstitutional action, Defendants attempt to miscast Plaintiffs by relying on cases that do not involve press access. To be clear, Plaintiffs are not J6 rioters, charities seeking to solicit donations on government property, or lobbyists. They are reporters engaged in newsgathering and providing political editorial opinion which is protected speech. Defendants cannot claim on the one hand their Capital Correspondent Guidelines ("CCA Guidelines") are viewpoint neutral and then point to the content of speech that Plaintiffs have engaged in that render them no longer "independent journalists." Even if Plaintiffs participated in overtly partisan political events, that *still* would not prohibit them from being "bona fide journalists." *TGP Comms., LLC v. Sellers,* 2022 WL 17484331 (9th Cir. 2022). Moreover, Defendants' denial of press passes to Plaintiffs based on expressions of support for, or opposition to, legislation creates a danger that the denial could constitute a punishment aimed at sanctioning and deterring their speech and thereby have a chilling effect on the press. *See Karem v. Trump,* 960 F.3d 656, 666 (D.C. Cir. 2020)(due process implicated by the suspension of a hard pass of member of the press is a punishment aimed at sanctioning and deterring conduct). The active role

the Defendant Capitol Correspondent Association ("CCA") plays in vetting and recommending which of their peers obtain press passes as a state actor is also constitutionally problematic despite their argument to the contrary.

At bottom, Defendants are attempting to avoid these constitutional mandates by characterizing the House's chamber as a nonpublic forum and by asserting that Plaintiffs are not "true journalists." Neither argument withstands scrutiny. Because Plaintiffs have shown a strong likelihood of success on the merits and the loss of their free-speech and free-press rights have caused them irreparable harm, the Court should grant the requested injunctive relief.

## ARGUMENT

### I. DEFENDANTS' FILINGS CONFIRM THAT PLAINTIFFS WERE EXCLUDED BASED ON THE CONTENT AND VIEWPOINTS OF THEIR SPEECH

Content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 162 (2015). The First Amendment provides even stronger protection against viewpoint discrimination, which "is an egregious form of content discrimination and occurs when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction on speech." *Alpha Delta Chi-Delta Chapter v. Reed,* 648 F.3d 790, 800 (9th Cir. 2011) (cleaned up). A restriction on speech is unconstitutional if it is "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). In evaluating claims of viewpoint discrimination, "[w]e thus look to the government's purpose as the threshold consideration." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994).

A recent opinion of the Ninth Circuit in *TGP Comms., supra,* is particularly instructive. In that case, Maricopa County, Arizona, rejected a press pass on the grounds that the plaintiffs (a) did not avoid real or perceived conflicts of interest, (b) were not free of associations that would compromise journalistic integrity or damage credibility," and (3) one plaintiff was "not a bona fide correspondent of repute in [his] profession." The record reflected that the rejection was in part due to one of the plaintiff's attendances at partisan political events. The County attempted to justify the rejection on the grounds that the County was "furthering the legitimate interest in disseminating accurate information manner "reasonably related to the viewpoint-neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." *Id.* at 5. Although the District Court initially rejected the *TGP Comms.* injunction request, the 9th circuit overturned the lower court decision, reasoning that the governments "politically-tinged assessment of Conradson's prior reporting that appears to have led it to deny him a press pass. That type of viewpoint-based discrimination is exactly what the First Amendment protects against."

Here, Defendants' factual submissions reveal that Plaintiffs Kruse and Hoffman were denied credentials because they allegedly engage in "campaigning," "advocacy," or political activity that closely mirror those that were rejected in *TGP Comms.* For example, Defendant Bernard Dean states that Kruse was denied because she had "actively campaigned for political candidates and public policy causes." Decl. of Bernard Dean ¶ 16. Dean similarly asserts that Hoffman engaged in political advocacy related to ballot initiatives. *Id.* ¶ 19. The House also relies on CCA Guidelines that disqualify individuals involved in lobbying, campaigning, or similar political activities. Decl. of Melissa Palmer ¶ 6.

These admissions confirm Plaintiffs' core claim, that the government denies press access to journalists whose speech or viewpoints *it* considers advocacy. But advocacy journalism is still journalism. The First Amendment does not create a government licensing system for determining which reporters are "objective enough" to qualify as members of the press. Indeed, Defendants' approach would disqualify large segments of the modern media—including opinion columnists, editorial boards, and investigative reporters who openly advocate policy positions. The Constitution forbids the government from deciding which viewpoints qualify as journalism.

Defendants rely heavily on *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021), in support of their contention that the CCA Guidelines are viewpoint neutral but that case is materially distinguishable. *MacIver* involved limited invitations to the governor's press briefings during the COVID-19 pandemic, where space constraints required selective access. *Id*. at 607–08. The Court emphasized there was no evidence that reporters were excluded because of their viewpoints. *Id*. at 613. Here, by contrast, Defendants expressly justify denying Plaintiffs press credentials because of their political advocacy and speech. Decl. of Bernard Dean ¶¶ 16, 19. Such viewpoint-based exclusion is precisely what the First Amendment forbids. *See Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977). Moreover, the Ninth Circuit *TGP Comms* rejected the district court's heavy reliance on *MacIver*, noting that there was no evidence that the criteria were manipulated in discriminatory manner. Here, Defendants' have betrayed ample proof that Plaintiffs were denied access due to their expressive activity, and so *MacIver* does not support Defendants' position. Defendants' arguments that the denial of the press passes to Plaintiffs did not violate their rights of freedom of speech and press under the U.S. and Washington Constitutions are without merit.

## II. THE HOUSE PRESS AREAS ARE AT LEAST A LIMITED PUBLIC FORUM

Defendants argue that the House's chamber press areas constitute a "nonpublic forum." Even if that characterization were to be accepted, Defendants still cannot prevail. Courts evaluating press access to government-controlled spaces have consistently recognized that when the government opens areas specifically for journalists to gather information, it creates at least a limited public forum for the press. The House has done exactly that. In traditional public forums—such as parks, streets, and other spaces traditionally held open for public speech—"the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *See Minn. Voters All. v. Mansky,* 585 U.S. 1, 11 (2018) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). In limited public forums, where the government opens a traditionally private place for speech on limited topics, the First Amendment's protections against content-based and viewpoint-based restrictions are robust. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (proscribing viewpoint discrimination "even when the limited public forum is one of its own creation").

Here, the House has established press tables specifically designated for journalists to have permitted press access to the wings. Decl. of Bernard Dean ¶ 9. It also issues press passes allowing credentialed reporters access to those areas. Decl. of Melissa Palmer ¶¶ 7–10. These areas exist for one purpose: facilitating newsgathering about legislative proceedings. Once the government opens such a forum to the press, it may not exclude journalists based on their supposed viewpoints. *Perry Educ. Ass'n,* 460 U.S. at 46.

Defendants' reliance on cases addressing purely internal government spaces outside of the context of journalism is misplaced. For example, Defendants' cite to *United States v. Nassif,* 97

F.4th 968 (2024). But that case involved a defendant involved in the January 6 riots who was contesting his conviction for "violent entry and disorderly conduct in the Capitol building." While the Court upheld the conviction acknowledging that the U.S. Capitol building is a non-public forum, Plaintiffs here seek to participate as members of the press in areas of the State House floor *specifically* designated for this purpose. Defendants also misrely upon *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788 (1985). There, the Court held that the government may restrict speech on government property, but within the context of a charity that wished to solicit contributions from government workers. *Id.* at 797.

The Defendants' position is similar to that which the U.S. Supreme Court critiqued in *Sherril v. Knight*, 569 F.2d 124 (D.C. Cir. 1977). There, the Court noted that the appellants argued that since the *public* has no right of access to the White House--and because the free-speech rights of the press are no greater than those of the general public--the denial of a press pass is only unconstitutional if it is based on the content of the journalist's speech or otherwise discriminates against a class of protected speech. The Court said that "there exist additional first amendment considerations ignored by Appellant's argument." *Id* at 5.

> White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, see Branzburg v. Hayes, 408 U.S. 665, 681, 707, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Pell v. Procunier, 417 U.S. 817, 829-35, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), requires that this access not be denied arbitrarily or for less than compelling reasons. See Southeastern Promotions v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

*Id.* Here, the State House of Representatives has voluntarily created a system specifically for press access to legislative proceedings. Having done so, it cannot selectively exclude disfavored reporters.

### III. DEFENDANTS' CRITERIA VIOLATE DUE PROCESS PROTECTIONS

Defendants contend that the CCA Guidelines do not violate due process because the "Press Policy is memorialized in writing and available to anyone." State Defendants' Response at 23. In addition, Defendants argue that the policy is not vague or ambiguous and that Plaintiffs were afforded an opportunity to appeal. These arguments are without merit. First, the decision to deny press presses to Plaintiffs was based on unpublished criteria. The letters provide the following sentence: "[t]he House, in part, looks to the Capitol Correspondents' [sic] Association (CCA) to make recommendations regarding whether a press pass applicant is a bona fide journalist or not." Plaintiff's Motion, Attachment 1 – Decl. of Jackson Maynard, Exhibits E, I, and J. This clear statement indicates that some factors were used to this decision. Defendants attempt to deflect this by referencing the Declaration of Melissa Palmer who stated:

> *[t]he House may also deny or later revoke a person's press access if the individual did not follow the House Rules, the Legislative Code of Conduct (displayed in full as a part of the House guidelines), or the house guidelines. To date, the house has not had occasion to deny a request based on House Rules, the Legislative Code of Conduct, or House guidelines that makes it clear that could be an outcome by noting on the application form that the House relies on the CCA recommendations, in part."*

Decl. of Melissa Palmer, *supra* at 2.

However, the letter does not reference revocation, but whether an applicant is "a bona fide journalist." Plaintiffs should have to guess at the standards or rules governing their constitutional right to a press pass.

Second, even assuming only the CCA Guidelines were the ones governing who constituted a "bona fide journalist" for the purposes of obtaining a press pass, the CCA Guidelines are vague and ambiguous. For example, the CCA Guidelines do not actually identify the criteria used to determine a "bona fide journalist" or even use that phrase. Plaintiff's Motion, Att. 1 – Decl. of

Jackson Maynard, Ex C.[1] In addition, Plaintiff Choe was prohibited from obtaining a press pass because he allegedly worked for a "publication or information source that is part of a larger non-news organization; this includes think tanks." *Id*. at Ex. I. The CCA Guidelines do not define news organization, although it does state that [t]he entity must be doing news for the sake of news alone." *Id*. Ex. C. Choe has stated in his declaration that he works for the Discovery Institute's news wing and "regularly produces journalistic content for national broadcast networks including ABC, NBC, FOX and CBS." Pl. Mot., Att. 3, Decl. of Jonathan Choe. This definition is *so* vague it rises to the level of being unworkable in today's media environment since few news organizations are not "part of" a non-news organization. For example, the Seattle Times Company is owned by the Blethen family and the McClatchy Company.[2] McClatchy is in turn owned by Chatham Asset Management, a New Jersey-based hedge fund.[3] McClatchy owns four other newspapers in Bellingham Herald, Tri-City Herald, The Olympian, and The News Tribune.[4] According to Defendants, press passes were granted to the *Seattle Times*, among others. Decl. of Melissa Palmer, at 6. What's good for the goose is good for the gander. If being "part of" a non-news organization disqualified a press pass applicant, members of the media from these news organizations should not have received them. It is difficult to ascertain the difference between the news wing of Choe's employer organization and a news wings of other non-news corporate entities and this lack of distinction renders this provision of the CCA Guidelines vague, ambiguous and unworkable.

---

[1] There is a certain irony that the CCA Guidelines indicate that the Association is "guided by the principal that [t]he press must be independent of government . . ." because "[b]luring that line would raise questions about the motives of everyone in the press corps, and risk having the Legislature revoke or restrict the access we have maintained in the public interest for many years.  Apparently that independence does not extend to vetting other members of the press on the government's behalf to determine whether their access to the Legislature is revoked or restricted. Plaintiff's Motion, Att. 1 – Decl.  of Jackson Maynard, Ex C.
[2] https://company.seattletimes.com/seattle-times-names-ryan-blethen-publisher-and-alan-fisco-chief-executive-officer/ (last accessed March 7, 2026).
[3] https://www.bradenton.com/news/nationMcClathyworld/national/article297018779.html (Last accessed March 7, 2026).
[4] https://apnews.com/general-news-eab2a6e84a7a09a35e8dd863d99f7c9c (Last accessed March 7, 2026).

The next unconstitutionally vague phrase as applied to the case at bar is the criteria that would prohibit a press pass to a person who "is or may become engaged in campaigns, lobbying, or the development of public policy" or who works for an entity "affiliated with" a lobbyist. The policy further provides this applies to one who is "a part of, or may become involved with, a party, campaign, or lobbying organization." This was the criteria used (in part) to disqualify press passes to Plaintiffs Hoffman and Kruse. Pl. Mot., Att. 1,Decl. of Jackson Maynard, Exhibits E and J. For the reasons argued above this is an impermissible viewpoint and content-based restriction that violates the first amendment.  However, as applied to Plaintiffs it is also vague and ambiguous. Plaintiffs are not lobbyists. Pl. Mot., Atts. 2, 3 and 4, Decls. of Hoffman, Choe, and Kruse. The difficulty is in determining who is "engaged in" or "part of" campaigns, lobbying, or the development of public policy. As noted in Plaintiff's Motion, several prominent news organizations have testified in favor of pending legislation and have editorial pages that support or opposed political candidates and policies.[5] Does this mean that reporters employed by these organizations that are "affiliated with" lobbyists are "part of" or "engaged in" political or lobbying activities? The lack of clarity invites arbitrary enforcement which is constitutionally suspect.

Defendants contend that the process used to appeal a denial was constitutionally adequate. The appeal process consisted of emailing the clerk and stating that the applicant wished to appeal the denial of the press pass without any initial explanation of the basis of the denial or full recitation of the criteria utilized in the decision. "This first amendment interest undoubtedly qualifies as [a]

---

[5] Defendant CCA misapprehends Plaintiffs referenced to the lobbying activities of the Washington Newspaper Association in its Motion. Response of CCA at 5.  The point is not that the Association lobbyist Rowland Thompson who is a registered lobbyist with the Public Disclosure Commission, unlike Plaintiffs, should get a press pass. https://www.pdc.wa.gov/political-disclosure-reporting-data/browse-search-data/lobbyists/18027-2025 (last accessed March 8, 2026) The argument is that CCA Guidelines are not limited to the individual applicant's activities but also who work for an entity "founded, funded, or affiliated with lobbyists . . ."  Pl. Mot., Att.1, Dec. of Jackson Maynard, Ex. C.  Because State Defendants admit that they have issued press passes to reporters with the Seattle Times - an entity that is at a minimum affiliated with lobbyists – then under the Defendants reasoning they also should have also been denied press passes but were not.

liberty [interest] which may not be denied without due process of law under the fifth amendment." *Sherrill,* 569 F.2d at 130 - 31. And due process requires the government to follow constitutionally "adequate procedures" before denying a protected liberty interest. *Id.* at 131 n.24. Indeed, because a denial of access "implicates important first amendment rights," the requirements of due process must be applied in a "particularly 'stringent'" manner. *Karem,* 960 F.3d at 665 (cleaned up) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 498 - 99 (1982)). Specifically, Defendants were required to provide Plaintiffs with (1) "notice of the factual bases for denial," (2) "an opportunity for the applicant to respond to these," and (3) "a final written statement of the reasons for denial" of access, (4) which reasons may not be "arbitrar[y]" or "less than compelling." *Sherrill*, 569 F.2d at 130. Here, although the Plaintiffs were told they could appeal the decision by email, there was no notice of the factual basis for the initial denial, and in the absence of an outline of any timeline, process, standard of review or appropriate grounds for appeal there was no realistic opportunity to respond. This is compounded when the criteria used to render the decision of whether Plaintiffs were bona fide journalists was only based, in part, on the CCA Guidelines. This does not comport with basic due process.

**IV.   DEFENDANTS' SCHEME VIOLATES THE NONDELEGATION DOCTRINE**

Under the nondelegation doctrine, the Legislature may grant regulatory authority to private parties only if proper standards, guidelines, and procedural safeguards exist. *Entertainment Indus. Coal. v. Tacoma-Pierce Cnty. Health Dep't,* 153 Wash.2d 657, 105 P.3d 985 (2005). Defendants' own evidence confirms that the CCA plays a role in determining which journalists receive press credentials. Palmer Decl. ¶¶ 4–6. Cornfield Decl. ¶¶ 9-10 noting that the CCA did not support Plaintiffs' request for a press pass. For the reasons identified above, the process of delegation of

the vetting and recommending to the House of Representative which members of the press are able to exercise their constitutional rights is procedurally flawed.

The CCA's strange assertion that is not a state actor when providing recommendations that are relied upon (at least in part) in determining who is a bona fide journalist strains credulity. Response by CCA at 7. It is clearly a state function, even if the CCA does want to admit this. The CCA's reliance on *Children's Health Def. v. Meta Platforms Inc.* 112 F.4th 742, 753 (9th Cir. 2024) is misplaced because, as noted in its response, there Meta was enforcing its own policy in the absence of any rule or law. The CCA ignores the factors identified in *Meta* for determining whether a private party is acting on behalf of the state for the purposes of analysis under the first amendment: (1) the private actor performs a traditionally public function, (2) the private actor is a "willful participant in joint activity" with the government (3) the government compels or encourages the private actor to take a particular action; or (4) there is a "sufficiently close nexus" between the government and the challenged action. *Id.* at 754. Here, there is more than sufficient evidence to demonstrate that the CCA is acting as the government's proxy in enforcing House rules and facilitating its press pass process. Allowing a private association—comprised largely of existing members of the press—to influence which journalists may access the legislature raises serious constitutional concerns. Defendants' system fails that requirement.

## V. PLAINTIFFS ARE SUFFERING ONGOING IRREPARABLE HARM

Defendants argue that Plaintiffs harm is speculative. That argument is specious at best. The press areas in the House chamber provide journalists with direct access to legislators during proceedings, enabling real-time reporting and questioning. Denying that access places Plaintiffs at a significant competitive disadvantage compared with credentialed journalists. Loss of First Amendment freedoms—even briefly—constitutes an irreparable injury. *Elrod v. Burns*, 427 U.S.

347, 373 (1976). Every legislative day that Plaintiffs remain excluded from the press areas is a day their constitutional rights are violated.

### VI. THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

The public interest strongly favors protecting press freedom and preventing government officials from deciding which journalists are acceptable. The Legislative session ends on March 12, 2026. There is no harm to the Defendants in granting press passes to Plaintiffs for the remaining roughly 72 hours of session after the hearing on the instant motion. Granting the requested injunction would not disrupt Legislative operations. Plaintiffs seek only the same access provided to other credentialed reporters. Defendants identify no concrete harm that would result from allowing Plaintiffs to occupy press tables already designated for journalists. By contrast, allowing the government to exclude reporters based on viewpoint threatens the core democratic function of the press: holding government accountable

### CONCLUSION

For these and the forgoing reasons, Plaintiffs respectfully request that their motion be granted.

DATED this 8th day of March 2026.

I certify that this memorandum contains less than 4200 words in compliance with Local Civil Rules.

*/s/ Jackson Maynard*
JACKSON WILDER MAYNARD, JR.
WSBA No. 43481
CITIZEN ACTION DEFENSE FUND
111 21st Ave SW
Olympia, WA 98501
(850) 519-3495

*/s/ Sam Spiegelman*
SAM SPIEGELMAN
WSBA No. 58212
CITIZEN ACTION DEFENSE FUND
111 21st Ave SW
Olympia, WA 98501
(201) 314-9505

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jackson Maynard, hereby declare under penalty of perjury under the laws of the State of Washington that I caused the foregoing to be filed with the clerk using the CM/ECF system, which will send notification of such filing to all counsel of record.

DATED this 8th day of March 2026.

/s/ Jackson Maynard
JACKSON WILDER MAYNARD, JR.
WSBA No. 43481
CITIZEN ACTION DEFENSE FUND
111 21st Ave SW
Olympia, WA 98501
(850) 519-349

*Attorney for Plaintiffs*