1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ARI HOFFMAN et al., | CASE NO. 3:26-cv-05214-DGE |
| Plaintiffs, | ORDER ON MOTION FOR |
| v. | TEMPORARY RESTRAINING |
| | ORDER (DKT. NO. 2) |
| WASHINGTON STATE HOUSE OF REPRESENTATIVES et al., | |
| Defendants. | |

## I    INTRODUCTION

This matter comes before the Court on the emergency motion for temporary restraining order ("TRO") filed by Plaintiffs Ari Hoffman, Jonathan Choe, and Brandi Kruse. (Dkt. No. 2.) Defendants Washington State House of Representatives, Bernard Dean, Legislature of the State of Washington, and State of Washington (the "House") submitted one response (Dkt. No. 13) and Defendant Washington State Capitol Correspondents' Association ("CCA") submitted a separate response (Dkt. No. 17). For the reasons that follow, Plaintiff's motion is DENIED.

1

## II    BACKGROUND

2

### A.  Factual Background

3    "It shall be the general policy of the house" to admit "[r]epresentatives of the press" to

4    the House chambers.  Wash. House of Rep. Rule 8 (reenacted as HR 4667, 69th Leg., Reg. Sess.

5    (Wash. 2026)).  For the last 50 years, the CCA coordinated the press credentialing at the

6    Washington State Legislature.  (Dkt. No. 2 at 34.)

7    The origins of this lawsuit lie in the denial of press passes to several individuals,

8    including Choe and Kruse, by the Washington State Senate during the 2025 legislative session.

9    (Dkt. No. 2 at 31.)  Counsel for these individuals sent a demand letter to the CCA on February

10    19, 2025, questioning the constitutionality of the press pass process.  (*Id.* at 31–32.)  House of

11    Representatives Chief Clerk Bernard Dean responded to the letter via email and indicated the

12    CCA had relinquished its role and that the legislature itself would be handling press credentialing

13    moving forward.  (*Id.* at 34.)  In their motion for TRO, Plaintiffs state the Senate eventually

14    issued passes to them and the other reporters subject to the February 19 letter; the email they cite

15    in support of this proposition suggests the press credentials were "previously authorized by the

16    CCA" and were "honored until a new [pass credential] system [was] in place."  (*Id.* at 9, 34.)  It

17    is unclear from the record whether Plaintiffs had previously received hard press passes for either

18    chambers at the legislature.

19    Later in 2025, the House of Representatives created a new press pass procedure for the

20    2026 legislative session, which required members of the press to apply for a press pass via a

21    form on the House of Representatives website.  (*Id.* at 9; Dkt. No. 1-2 at 5.)  There are two types

22    of passes: a "hard pass" and a "day pass."  (Dkt. No. 15 at 3.)  Hard passes are "intended for

23    individuals whose primary reporting location is Olympia and with a legislative focus, who

24

1    presumably will be onsite often." (*Id.*)  A day pass is for all other journalists.  (*Id.*)  A journalist

2    seeking a daily pass may request up to five daily passes at once.  (*Id.*)  A hard pass and a day

3    pass "give [an] individual the same access" to the House, "which is the wings and press table

4    within the House chamber." (*Id.*)  Access to the galleries, which overlook the House floor,

5    "remain open to those non-credentialed journalists wishing to observe floor proceedings."  (Dkt.

6    No. 14 at 5.)  Journalists must reapply for a press pass each year.  (Dkt. No. 15 at 4.)

7              Press Pass Application & CCA Guidelines

8              Melissa Palmer, the Deputy Chief Clerk for the House, stated in her declaration that the

9    House follows a standardized process for floor press pass requests.  (*Id.* at 2.)  The online

10   application form states the House will issue floor press passes to individuals who meet the CCA

11   guidelines, "informed by CCA recommendations." (*Id.* at 10.)  Plaintiffs assert the CCA

12   guidelines are not publicly posted and can only be obtained upon individual request.  (Dkt. No. 2

13   at 10.)  The House's evidence appears to support this position.  (*See* Dkt. No. 15 at 2) (the press

14   pass application explains that the CCA guidelines are "'available upon request'").

15            While the CCA makes recommendations to the House regarding press pass applications,

16   "the House approves or denies access." (*Id.*)  It may also deny or later revoke a press pass if the

17   holder of the pass does not follow the House rules, House guidelines, or the Legislative Code of

18   Conduct.  (*Id.*)  The House has not yet denied a request based on these requirements but it

19   "makes clear that could be an outcome by noting on the [press pass] application form that the

20   House relies on the CCA recommendations 'in part.'" (*Id.*)  In issuing press passes, the House

21   considers the organization or entity the person works for or represents, the role the person holds

22   at that entity, and the person's participation in campaigns, policy development, and/or lobbying.

23   (*Id.* at 4.)  The CCA provides recommendations to the official House press pass email regarding

24

1    who should be issued a pass.  (*Id.*)  If someone is denied a pass, they are sent a "standard email"

2    which explains they can appeal the decision to the Chief Clerk's Office.  (*Id.*)  "The appeal

3    process does not have a set timeline as the process and passes are valid for the duration of a

4    legislative session.  An individual may opt to appeal right away or wait; the House aims to

5    respond within two days either way."  (*Id.*)

6        Relevant here, the CCA guidelines recommend "issuing credentials only to professional

7    journalists.  This means that reporting or shooting is your primary job, and that job is the source

8    of most of your income."  (Dkt. No. 2 at 37.)  The guidelines "do not support providing

9    credentials to people who work for any publication or information source that is part of a larger

10   non-news organization[,]" as the entity "must be doing news for the sake of news alone."  (*Id.* at

11   38.)  The CCA also "will not support the providing of a credential to a person who is or may

12   become engaged in campaigns, lobbying, or the development of public policy[,]" as "[i]t is

13   important that a line be established between professional journalism and political or policy

14   work."  (*Id.*)

15       Plaintiff Hoffman

16       Plaintiff Ari Hoffman is a Washington reporter who broadcasts on AM 570 KVI, a news

17   and commentary media company.  (*Id.* at 69.)  Hoffman has produced journalistic content for

18   broadcast, print, and digital media, including Newsweek, Fox News, Newsmax, The Post

19   Millennial, and Human Events.  (*Id.* at 70.)  He provides "editorial political opinions from time

20   to time, but [is] not employed in campaigns and [he does] not engage in campaigns, lobbying, or

21   in the development of public policy."  (*Id.*)

22       On January 26, 2026, Hoffman completed the online application for a daily press pass for

23   January 29.  (*Id.*)  In a letter dated January 28, 2026, Dean denied Hoffman's press pass request.

24

1    (*Id.* at 55.)  The letter noted the House, "in part, looks to the Capitol Correspondents'

2    Association (CCA) to make recommendations regarding whether a press pass applicant is a bona

3    fide journalist or not." (*Id.*)  Hoffman's press pass request was denied "[b]ased on [his] recent

4    engagement in public policy development and advocacy." (*Id.*)  On January 29, 2026, Hoffman

5    sent a letter to Dean, House Speaker Laurie Jinkins, and CCA representative Jerry Cornfield to

6    appeal the denial.  (*Id.* at 50.)  In a letter dated February 3, 2026, Dean denied Hoffman's appeal,

7    noting that the determination "was based on the application of longstanding, viewpoint-neutral

8    criteria governing press credentials at the Legislature." (*Id.* at 57, 70.)

9           In her declaration, Palmer states Hoffman's press pass was denied because he was

10   featured as a guest speaker at Let's Go Washington's "Super Signer Rally" on November 16,

11   2025, "in support of two initiatives to the Legislature that are pending this session: IL26-001 and

12   IL26-638." (Dkt. No. 15 at 5.)  Palmer declares Let's Go Washington is a registered political

13   action committee (PAC) that "sponsors and advocates for initiatives." (*Id.* at 5, 30.)

14          <u>Plaintiff Choe</u>

15          Plaintiff Jonathan Choe is a professional journalist with the news site

16   www.fixhomelessness.com, a Senior Fellow at the Discovery Institute's news wing, the Seattle

17   bureau reporter for cable channel Newsmax, and the lead investigative reporter for Frontlines

18   TPUSA.  (Dkt. No. 2 at 72.)  Choe "regularly produce[s] journalistic content for national

19   broadcast networks, including ABC, NBC, FOX, and CBS," and regularly contributes to the

20   *Lynnwood Times*.  (*Id.* at 72–73.)  Choe acknowledges that reporting "is part of [his] primary job

21   which is the source of most of [his] income." (*Id.*)  Choe provides "editorial political opinions in

22   [his] work but do[es] not engage in campaigns, lobbying, or in the development of public

23   policy." (*Id.* at 73.)

24

1    On February 2, 2026, Choe applied for a daily press pass for February 2–6.  (*Id.*)  On the

2    same day, Laura Monroe, Legislative Information Center ("LIC") Manager, emailed Choe that

3    his request for a House press pass was declined.  (*Id.* at 61–63.)  When Choe requested a reason

4    for the denial, Monroe responded that "[a]pprovals and denials are based on Capitol

5    Correspondence [sic] Association's recommendations and may be appealed by contacting the

6    Chief Clerk's Office in writing."  (*Id.* at 61.)  Choe appealed on February 3, 2026.  (*Id.*)  In a

7    letter dated February 4, 2026, Dean acknowledged receipt of Choe's appeal and noted that the

8    House "in part, looks to the Capitol Correspondents' Association (CCA) to make

9    recommendations regarding whether the process pass applicant is a bona fide journalist or not."

10   (Dkt. No. 2 at 65.)  The letter noted that Choe indicated he represented the "Discovery

11   Institute/Frontlines TPUSA[,]" and per the CCA guidelines, "credentials are not provided to

12   individuals who work for any publication or information source that is part of a larger non-news

13   organization," which included think tanks.  (*Id.*)

14       Palmer states in her declaration that Choe's application for a press pass did not mention

15   that he was applying in association with the *Lynwood Times*.  (Dkt. No. 15 at 7; *see also* Dkt. No.

16   2 at 62 (Choe's application for press pass listing "Discovery Institute/Frontlines

17   TPUSADiscovery Institute/Frontlines TPUSA").)  When his appeal was denied, Choe asked via

18   email whether he should reapply in association with the *Lynwood Times* (*id.* at 60) and the

19   Clerk's office told him to "apply under the news outlet you plan to represent when you seek

20   admission to the chamber."  (*Id.* at 59.)  Choe did not resubmit a press pass application with a

21   *Lynwood Times* affiliation.  (Dkt. Nos. 14 at 7; 15 at 7.)

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Plaintiff Kruse

Plaintiff Brandi Kruse hosts the Undivided Podcast and previously worked as a television journalist for Fox 13 Seattle.  (Dkt. No. 2 at 75.)  Kruse provides "editorial political opinions in [her] work but [is] not employed in campaigns and do[es] not engage in campaigns, lobbying, or in the development of public policy."  (*Id.* at 76.)  Kruse acknowledges that reporting is part of her primary job and the source of most of her income.  (*Id.* at 75.)  Kruse applied for press passes for February 2 and 6.  (Dkt. No. 14 at 58–60.)

On February 2, 2026, Kruse sent an email to the House's Chief Clerk's Office acknowledging her press pass request had been denied and requesting an explanation in writing. (*Id.* at 66.)  In a letter dated February 4, 2026, Dean acknowledged receipt of Kruse's "appeal" and noted that the House "in part, looks to the Capitol Correspondents' Association (CCA) to make recommendations regarding whether the process pass applicant is a bona fide journalist or not."  (Dkt. No. 2 at 67.)  Dean stated Kruse's House floor press pass was denied "[b]ased on [her] recent engagement in public policy development and advocacy[.]"  (*Id.*)  As with Hoffman and Choe's letters, Kruse's denial letter quoted language from the CCA guidelines.  (*Id.*)

Palmer states that on February 2, when Kruse submitted her press pass application, "[Kruse] was scheduled to speak at a Let's Go Washington rally the next day, February 3, 2026, on the north steps of the Legislative Building in support of Let's Go Washington's initiatives." (Dkt. No. 15 at 6, 35.)  Kruse was also apparently a "featured speaker" at a Let's Go Washington "Super Signer Rally" on November 23, 2025, in support of the PAC's initiatives to the legislature for the 2026 legislative session.  (*Id.* at 7.)

1

### B. Procedural History

2       On February 10, 2026, Plaintiffs filed suit against Defendants in Thurston County

3   Superior Court for violations of the federal and state constitutions.  (Dkt. No. 1-2.)  Plaintiffs

4   assert three causes of action: (1) violation of the First Amendment of the United States

5   Constitution and Article I, Section 5 of the Washington Constitution; (2) violation of due process

6   under the Fourteenth Amendment to the United States Constitution and Article I, Section 3 of the

7   Washington Constitution; and (3) violation of the Washington non-delegation doctrine.  (*Id.* at

8   11–17.)  On March 2, 2026, Defendants removed the case to federal court.  (Dkt. No. 1.)  On

9   March 4, 2026, Plaintiffs filed an emergency motion for TRO.  (Dkt. No. 2.)  Defendants filed

10  notices of intent to respond to the emergency motion for TRO.  (Dkt. Nos. 3, 5.)  The Court

11  issued a briefing schedule ordering Defendants' response on March 6, 2026, and Plaintiff's reply

12  on March 8, 2026.  (Dkt. No. 7.)  The Parties timely submitted their response and reply briefs.

13  (Dkt. Nos. 13, 17, 21.)  The Court heard oral argument on March 9, 2026.  (*Id.*)

### III      LEGAL STANDARD

15      Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO.  To obtain a TRO,

16  the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of

17  irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of

18  equities tips in favor of the moving party; and (4) that an injunction is in the public

19  interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Generally, a TRO is "an

20  extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

21  to such relief." *Id.* at 22.  The moving party has the burden of persuasion.  *Hill v. McDonough*,

22  547 U.S. 573, 584 (2006).  "The third and fourth factors . . . merge when the Government is the

23  opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Courts consider the same factors

24

1    when ruling on a motion for TRO as a motion for preliminary injunction.  *See Stuhlbarg Int'l*

2    *Sales Co. Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (the analysis

3    for a TRO and a preliminary injunction are "substantially identical").

4         The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to

5    which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

6    weaker showing on the merits, combined with a stronger demonstration on the balancing test,

7    might warrant preliminary injunctive relief, assuming the second and fourth Winter elements are

8    met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).  Under this

9    "sliding scale" method, the movant need only raise "serious questions going to the merits," but

10   the balance of hardships must tip "sharply" in the movant's favor.  *Id.* at 1131–1132*; see also*

11   *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

12        A motion for TRO seeks mandatory relief when it asks a court to order a party to take

13   action.  *Garcia v. Google, Inc*. 786 F.3d 733, 741 (9th Cir. 2015) ("relief is treated as a

14   mandatory injunction because it orders a responsible party to take action" (internal quotations

15   omitted)).  It goes beyond maintaining the status quo *pendente lite*.  *Id*.  Such relief is disfavored

16   and "should not issue in 'doubtful cases.'"  *Id*. (quoting *Park Vill. Apartment Tenant Ass'n v.*

17   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

18                    **IV    DISCUSSION**

19        **A.  Likelihood of Success on the Merits**

20        The Ninth Circuit considers the likelihood of success on the merits as "'the most

21   important' *Winter* factor; if a movant fails to meet this 'threshold inquiry,' the court need not

22   consider the other factors[.]"  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir.

23   2017) (citation omitted).  Even if a likelihood of success is not established, a TRO may be

24

1  appropriate "if a movant raises 'serious questions going to the merits' and the 'balance of

2  hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are

3  satisfied." *Id.* (quoting *Cottrell*, 632 F.3d at 1134–1135).

### 1. First Amendment and the Press

5  The First Amendment provides, in relevant part: "Congress shall make no

6  law . . . abridging the freedom of speech, or of the press[.]"  U.S. CONST. amend. I.  This protects

7  not only the freedom to publish news and opinion, but also the freedom to engage in news

8  gathering.  *TGP Commc'ns LLC v. Sellers*, 642 F. Supp. 3d 957, 963 (D. Ariz. 2022) (citing *Cal.*

9  *First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1988)).  "The right of the press to

10  gather news and information is protected by the First Amendment because 'without some

11  protection for those seeking out the news, freedom of the press could be eviscerated.'"

12  *Calderon*, 150 F.3d at 981 (citation omitted).  As with other core constitutional rights,

13  "allegations of suppression of the media must be sufficiently alleged to withstand" dismissal.

14  *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 605 (7th Cir. 2021) (affirming

15  summary judgment for the government on the plaintiff reporters' First Amendment claims).

16  The Court looks to cases from other districts and circuits to frame the issues in this

17  matter.  The D.C. Circuit has read the First and Fifth Amendments together to prohibit the denial

18  of a journalist's access to the White House Press Area without due process protections.  *See*

19  *Sherill v. Knight*, 569 F.2d 124, 129–131 (D.C. Cir. 1977); *Karem v. Trump*, 960 F.3d 656, 664–

20  667 (2020).  That same reading was cited favorably in *Alaska Landmine, LLC v. Dunleavy* in the

21  context of the Alaska State Legislature's denial of press passes to journalists at gubernatorial

22  press conferences.  514 F. Supp. 3d 1123, 1127–1128, 1131–1133 (D. Alaska 2021).  The court

23  in *Sherill* maintained that media access to government facilities should "not be denied arbitrarily

1  or for less than compelling reasons." 569 F.2d at 129. Put another way, journalists, the

2  publications for which they write, and the general public "have an interest protected by the

3  [F]irst [A]mendment in assuring that restrictions on newsgathering be no more arduous than

4  necessary, and that individual newsmen not be arbitrarily excluded from sources of information."

5  *Id.* at 129–130. Those due process concerns were underscored in *Getty Images News Services,*

6  *Corp. v. Dep't of Def.*, when the district court for the District of Columbia held that, "at a

7  minimum," the First and Fifth Amendments require that the government "must not only have

8  some criteria to guide its determinations [of which media organizations receive access], but must

9  have a reasonable way of assessing whether the criteria are met." 193 F. Supp. 2d 112, 121

10  (D.D.C. 2002). Therefore, because of the importance of First Amendment rights, "the

11  government must publicly memorialize the applicable standards to ensure both due process and

12  compelling government interests for any and all denials of access." *Alaska Landmine*, 514 F.

13  Supp. 3d at 1132 (citing *Sherill*, 569 F.2d at 129–130).

## 2.  First Amendment Forum Analysis

15  The First Amendment does not guarantee journalists "a constitutional right of special

16  access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665,

17  684 (1972). That said, "[t]he amount of access to which the government must give the public for

18  First Amendment activities, and the standards by which a court will evaluate limitations on those

19  rights, depends on the nature of the forum at issue." *MacInver Inst.*, 994 F.3d at 609. "'[T]o

20  evaluate government restrictions on purely private speech that occurs on government property,'

21  [courts] first consider the level of First Amendment scrutiny that should be applied." *Ateba v.*

22  *Leavitt*, 133 F.4th 114, 121 (D.C. Cir. 2025) (quoting *Walker v. Tex. Div., Sons of Confederate*

23  *Veterans, Inc.*, 576 U.S. 200, 215 (2015)). "[T]he extent to which the Government can control

24

access [to a forum it owns or controls] depends on the nature of the relevant forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

The Parties here initially seemed to agree the House floor is a nonpublic forum. (Dkt. Nos. 2 at 17; 13 at 19–20.) In their reply and at the hearing, Plaintiffs clarified their position that the House press area is "at least" a limited public forum and that the denial of their press passes constitutes impermissible viewpoint suppression. (Dkt. No. 21 at 9.)

A limited public forum is "government property that is made available for 'use by certain groups or dedicated solely to the discussion of certain subjects.'" *Ateba*, 133 F.4th at 122 (citations omitted). These fora are "generally open to [] designated groups or for the designated purpose of discussing particular topics." *Id.* Examples of limited public fora include school board meetings, *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 n.7 (1983), or student elections, *Flint v. Dennison*, 488 F.3d 816, 832 (9th Cir. 2007). These constitute limited public fora because the government may proscribe certain regulations on who can participate or how speech may be conducted. *E.g.*, *Spears v. Ariz. Bd. of Regents*, 409 F. Supp. 3d 779, 786 (D. Ariz. 2019) (discussing *Flint* and explaining that regulations on who could be a candidate, like minimum GPA, or who could vote, like minimum credit hours, were permissible; regulations on the means by which a candidate could campaign were also permissible).

By contrast, nonpublic fora are areas that do not traditionally serve as a forum for public communication; the government may impose restrictions based on subject matter and speaker identity "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. While there is no requirement that the government open such spaces for speech, once it provides "'selective access for individual speakers,'" a nonpublic forum is created. *Ateba*, 133 F.4th at 122 (citation omitted).

1    Examples of nonpublic fora include military bases, *Greer v. Spock*, 424 U.S. 828, 835–838

2    (1976), airport terminals, *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679

3    (1992), or the lobbies of state or county buildings, *Grossbaum v. Indianapolis-Marion Cnty.*

4    *Bldg. Auth.*, 100 F.3d 1287, 1297–1299 (7th Cir. 1996).  Government office buildings and

5    United States Capitol buildings are also considered nonpublic forums.  *Ateba*, 133 F.4th at 122

6    (U.S. Capitol buildings are nonpublic forums "even though members of the public regularly

7    enter for the purpose of expressive activity, because entry is still 'strictly regulated' and the

8    communications are 'scheduled and controlled.'" (citation omitted)).

9            The Court concludes, in line with the D.C. Circuit, that the House press area is a

10    nonpublic forum.  *See id.*.  Like the White House Press Area in *Ateba*, which had its own set of

11    restrictions and was limited to "journalists who satisfy the White House's admission criteria,"

12    *id.*, the press area at issue here is plainly subject to access and credential restrictions.  (*See* Dkt.

13    No. 2 at 37–38.)  Plaintiff argues that "[o]nce the government opens such a forum to the press, it

14    may not exclude journalists based on their supposed viewpoints."  (Dkt. No. 21 at 9.)  This sort

15    of characterization of the issue was considered—and expressly dismissed—in *Ateba*.  There, the

16    court held the plaintiff's argument that the press area was open to a "class of journalists" did not

17    account for the fact there were clear limits imposed on who may be admitted to the press area to

18    begin with.  133 F.4th at 123.  The court dismissed the plaintiff's argument because the press

19    area was "not generally open to a class of speakers."  *Id.*  Similarly here, Plaintiffs argue that the

20    House press area has been opened to the press generally but ignores the limits that the House has

21    imposed on who may be admitted to the press area, *independent* of any supposed viewpoint.

22    Therefore, like the D.C. Circuit in *Ateba*, the Court has "no trouble concluding [the House floor

23    press area] is a nonpublic forum."  *Id.*.  The press pass policy will therefore be evaluated for

24

reasonableness and viewpoint neutrality.[1]  *Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

### a. Plaintiffs fail to show the CCA policy is unreasonable.

The Supreme Court has given the government "substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified in light of the forum's purpose." *Ateba*, 133 F.4th at 123 (citations omitted).  "The [House]'s decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation[,]" *Cornelius*, 473 U.S. at 808, and reasonableness "may be established by evidence in the record or even by a commonsense inference." *Price v. Garland*, 45 F.4th 1059, 1072 (D.C. Cir. 2022).

Here, Plaintiffs do not appear to challenge press credentialing itself under the First Amendment.  Instead, Plaintiffs assert the press pass scheme is not reasonable because (1) it is "unpublished, vague, ambiguous, and unenforceable"; (2) it is not applied "uniformly or even consistently"; (3) there is a lack of due process standards in the appeals process; and (4) offering a day pass is not an "adequate substitute for full credentials." (Dkt. No. 2 at 18.)  The House disagrees with all four arguments and asserts that the CCA guidelines and restrictions are consistent with the House's purpose in "debat[ing] and pass[ing] laws without interruption or lobbying in that space." (Dkt. No. 13 at 21–23.)

The CCA guidelines read, in relevant part:

---

[1] At oral argument, counsel for the House identified a recent decision indicating that restrictions involving limited public fora are subject to the same analysis as restrictions involving nonpublic fora. *See Youth 71Five Ministries v. Williams*, 160 F.4th 964, 986 (9th Cir. 2025), *petition for cert. docketed*, Case No. 25-776 (2026) (applying reasonableness and viewpoint neutrality analysis to a limited public forum).

We recommend issuing credentials only to professional journalists. This means that reporting or shooting is your primary job, and that job is the source of most of your income.

The Association recommendations are guided by this principle: The press must be independent from the government and from the political parties, their constituent groups, and the many organizations which have a stake in the Legislature's proceedings. Blurring that line would raise questions about the motives of everyone in the press corps, and risk having the Legislature revoke or restrict the access we have maintained in the public interest for many years.
. . .

A credential-seeker's employer must be a news organization, full stop. . . . The entity must be doing news for the sake of news alone.
. . .

The Association will not support the providing of a credential to a person who is or may become engaged in campaigns, lobbying, or the development of public policy. Giving a relatively inconsequential amount of money to some organization probably is not enough to trigger this rule. Anything beyond that probably is.

It is important that a line be established between professional journalism and political or policy work. This is the spirit in which the Legislature has offered access: The press should act as an independent observer and monitor of the proceedings, not an involved party.

This means that we cannot endorse offering credentials to one who is part of, or may become involved with, a party, campaign or lobbying organization. We also can't support providing a credential to folks who do any sort of consulting, advising, writing, or other work, whether paid or unpaid, for a politician, public official, party organization, lobbying shop, etc. The disqualification is also retroactive: If someone is credentialed and then becomes involved in such activities, the Association would recommend the credential be invalidated.

(Dkt. No. 2 at 37–38.)

The Court is unable to conclude at this time that these guidelines are unreasonable or not intended to ensure those who obtain press passes are "professional journalists" employed by "news organization[s]," which is reasonably related to the goal of establishing a line "between professional journalism and political or policy work." (*Id.*) Even further, the guidelines identify a clear directive in maintaining an independent press separate from the government, political

1  parties, and interested groups.  (*See* Dkt. No. 2 at 37) ("Blurring that line would raise questions

2  about the motives of everyone in the press corps[.]").  In other cases analyzing press pass access,

3  courts have upheld restrictions that limit access to "bona fide journalists" who are "employed by

4  a news organization[.]"  *Ateba*, 133 F.4th at 118; *see also MacIver Inst.*, 994 F.3d at 606 (media

5  passes are limited to those that are, among other things, "a bona fide correspondent of repute in

6  their profession" and are employed by an organization "whose principal business is news

7  dissemination").  Courts have also upheld restrictions for applicants who are "engaged in any

8  lobbying, paid advocacy, advertising, publicity[,] or promotion work[.]"  *MacIver Inst.*, 994 F.3d

9  at 606, 610.  Similarly here, the CCA requirements are reasonably related to the House's stated

10  goals.  *Id.* ("The criteria are . . . reasonably related to the viewpoint-neutral goal of increasing

11  journalistic integrity by favoring media that avoid real or perceived conflicts of interest or

12  entanglement with special interest groups, or those that engage in advocacy or lobbying.").

13      Plaintiffs leverage four arguments for the unreasonableness of the press pass policy.

14  First, they argue the policy is ambiguous and unenforceable.[2]  (Dkt. Nos. 2 at 18; 21 at 11–13.)

15  Specifically, they allege the guidelines do not actually define the criteria used to determine who

16  is a qualified journalist and who is not, arguing the standards are "unworkable" given the fact

17  "few news organizations are not 'part of' a non-news organization."  (Dkt. No. 21 at 11–12.)

18  Essentially, their argument appears to be that because so many news outlets are owned by non-

19

20  [2] In their motion for TRO, Plaintiffs do not provide much detail to color in their argument that
    the CCA policy is vague and ambiguous in violation of the First Amendment.  (*See* Dkt. No. 2 at

21  18.)  The House points out as much in its response brief.  (*See* Dkt. No. 13 at 22–23.)  In their
    reply, Plaintiffs more fully explain their position that the guidelines are vague because they do

22  not define the relevant terms (such as "journalist" or "affiliated with" a lobbying organization) or
    explain how these terms apply consistently in "today's media environment[.]"  (Dkt. No. 21 at

23  12–13.)  Though these arguments are framed as due process (rather than First Amendment)
    considerations, because of the overlapping constitutional interests at issue, the Court will

24  consider them in both the First Amendment and due process context.

news companies, the distinction between the two collapses, and therefore the CCA policy is

ambiguous.  (*Id.*)  But Plaintiffs ignore that credentials are issued on a person-by-person basis,

and "an individual journalist is not ineligible for a House floor press pass because someone else

working at their news organization testified on a bill, provided the news organization exists for

the purpose of disseminating news (not lobbying)."  (Dkt. No. 15 at 7–8.)  Further, one

journalist's disqualifying activity, such as providing testimony on proposed legislation, does not

disqualify others working at their news organization.  (*Id.* at 7.)  This case-by-case approach is

emphasized in the emails between the Clerk's Office and Choe regarding his denial: "I would

suggest that you apply under the news outlet *you plan to represent* when you seek admission to

the chamber."  (Dkt. No. 2 at 59) (emphasis added).  It is not unreasonable, based on

"commonsense inference," to restrict press area access to journalists who are not actively

engaged in lobbying or other policy work and to conduct an individualized inquiry into which

journalists qualify based on the news organization they are representing at the time they apply

for a pass.  *See Price*, 45 F.4th at 1072.

Plaintiffs' second argument that the policy is "not applied uniformly or even

consistently" (Dkt. No. 2 at 18) fares no better.  Though they point by example to SB 5400, a

2025 bill, and argue there are other members of the press who "routinely testify on pending

legislation[,]" Plaintiffs do not identify whether any of the journalists who testified in support of

SB 5400 actually applied for (or were denied) a House press pass.  (Dkt. Nos. 2 at 11; 15 at 7.)

They posit that if the House has issued press passes to reporters with the *Seattle Times*, "an entity

that is at a minimum affiliated with lobbyists[,]" then those reporters should have been denied

press passes like Plaintiffs.  (Dkt. No. 21 at 13 n.5.)  When pressed at the hearing, Plaintiffs were

still unable to point to other reporters who were similarly situated to Plaintiffs but were granted

passes.  As with their first argument, Plaintiffs ignore the individualized context in which passes are issued or denied.  As Palmer declared, applicants other than Plaintiffs have been denied press passes pursuant to the CCA guidelines this legislative session, and each applicant is assessed based on "their role at the organization, and their political activities (if any)."  (Dkt. No. 15 at 7–8.)  Without evidence to the contrary, Plaintiffs' argument is unavailing.

Third, Plaintiffs argue the press policy is unreasonable because there is a lack of due process standards for appeals of press pass denials.  (Dkt. No. 2 at 18.)  The House asserts that it "promptly reviewed" Plaintiffs' appeals, "explained exactly how and why" Plaintiffs did not satisfy the press policy, and "immediately answered their questions."  (Dkt. No. 13 at 23.)  As stated, government restrictions to a nonpublic forum need not be the most reasonable or only reasonable limitation, and reasonableness can be inferred from common sense.  *Cornelius*, 473 U.S. at 808; *Price*, 45 F.4th at 1072.  Here, the record shows the House responded quickly to Plaintiffs' appeals and explained the basis for the denial by reference to the CCA guidelines.  (*See* Dkt. No. 2 at 70 (Hoffman's appeal denied three business days after appeal), 73 (Choe's appeal denied two business days after appeal), 76 (Kruse's appeal denied two business days after appeal).)  Indeed, though the appeal process has no set timeline, the House "aims to respond within two days[.]"  (Dkt. No. 15 at 4.)  In a content-neutral scheme such as this one, the House need not abide by specific deadlines and may exercise "'traditional' authority to 'ensure the safety and convenience of the people,' as a means of 'safeguarding . . . good order.'"  *Ateba*, 133 F.4th at 127 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002) (cleaned up)).  Plaintiffs point to the due process requirements outlined in *Sherill* to argue that the House has not met its burden, but it appears from the record that Plaintiffs were provided notice of the basis for their denials, an opportunity to respond, and a final written statement of the reason for the denial

that was not arbitrary or "less than compelling." (*See* Dkt. No. 21 at 14) (citing *Sherill*, 569 F.2d at 130). Though Plaintiffs' may desire more expediency or specificity about why they were denied press passes, that desire does not amount to a constitutional injury.

Finally, while the District of District Columbia suggested that requiring journalists to use a day pass rather than a hard pass burdens their access rights "to some degree[,]" it is clear from this record that Plaintiffs did not hold, nor did they apply for, hard passes during the relevant timeframe.[3] *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 77 (D.D.C. 2023); (Dkt No. 2 at 50–52, 58–60, 69–71) (Plaintiffs' applications for day passes). Therefore, this fact alone does not make the entire press pass scheme unreasonable. *Cornelius*, 473 U.S. at 808.

### b. Plaintiffs fail to show the House press policy is viewpoint discriminatory.

"Viewpoint discrimination is an 'egregious form of content discrimination,' which occurs when a government regulation 'targets not subject matter, but particular views taken by speakers on a subject.'" *Ateba*, 133 F.4th at 124 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)). The government may not exclude speech where its content-based distinction is not "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806.

---

[3] The D.C. Circuit did not explicitly adopt this holding when reviewing the district court's analysis on appeal. It noted that a "hard pass merely offers convenience" and "reliev[ed] [the plaintiff] of the obligation to apply for day passes." *Ateba*, 133 F.4th at 121. However, "[e]ven assuming that the lack of a hard pass is a First Amendment harm, the burdens imposed by the Hard Pass Policy [were] not unconstitutional." *Id.* This Court agrees that applying for day passes, which must be done in advance, likely creates some burden on Plaintiffs. (Dkt. No. 15 at 3) ("The House issues daily floor press passes the Monday of each week[.]"). But because hard passes and daily passes give pass holders the same access (*see id.*), and because Plaintiffs never applied for hard passes this legislative session, the burden does not rise to the level of a constitutional violation. *See Ateba*, 133 F.4th at 121.

1    Here, Plaintiffs argue the press pass credentials are not viewpoint neutral and that the

2    press pass scheme "has the effect of suppressing opposing viewpoints because it is commonly

3    known that Plaintiffs have been supportive of certain legislation and made editorial comments

4    critical of other proposals." (Dkt. No. 2 at 18.)  The House disagrees and points out that the

5    press policy does not reference viewpoints in either language or application. (Dkt. No. 13 at 24.)

6    The Court agrees with the House.

7        The plain language of the press policy does not reference viewpoints. (*See* Dkt. No. 2 at

8    37–38.)  Indeed, its guiding principle is neutral: "The press must be independent from the

9    government and from the political parties, their constituent groups, and the many organizations

10    which have a stake in the Legislature's proceedings." (*Id.* at 37.)  Consistent with the Seventh

11    Circuit's holding in *MacIver Inst.*, "[t]here is nothing inherently viewpoint-based about [the

12    CCA] criteria" and there is no evidence that the House "manipulates these neutral criteria in a

13    manner that discriminates against conservative media[]" as Plaintiffs contend.  994 F.3d at 611.

14    Nor do Plaintiffs provide evidence of a similarly situated reporter working for a news

15    organization from a different ideological background that was issued a press pass when Plaintiffs

16    were not.  "[T]he inclusion of a broad range of media outlets on both sides of the political

17    spectrum certainly diminishes any claim that the list is based on political ideology." *Id.*; (*see

18    also* Dkt. No. 15 at 5–6) (the House press pass application "has nothing to do with the political

19    leanings of a news organization" and the House has issued press passes to individuals with a

20    "wide range of news organizations[.]").  And perhaps more fundamentally, Plaintiffs offer no

21    evidentiary support for their belief that their exclusion was ideologically motivated, rather than

22    rooted in their failure to meet the neutral standards laid out in the CCA guidelines.

23

24

1    Instead, Plaintiffs argue viewpoint discrimination is evidenced by the House's reasons for

2    denying them press passes; namely, for "allegedly engag[ing] in 'campaigning,' 'advocacy,' or

3    political activity[.]" (Dkt. No. 21 at 7.)  According to Plaintiffs, these are the type of criteria the

4    Ninth Circuit has rejected as not being viewpoint neutral.  (*Id.*) (citing to *TGP Commc'ns, LLC v.*

5    *Sellers*, 2022 WL 17484331 (9th Cir. 2022)).  But the Court sees a distinction between "[r]elying

6    on a reporter's attendance at political party events" to deny a press pass, *TGP Commc'ns*, 2022

7    WL 17484331, at *4, versus denying a press pass based on a reporter's campaign and advocacy

8    activities in favor of legislation *before the body contemplating such legislation*.  Moreover, *TGP*

9    *Commc'ns* is distinguishable because the evidence suggested the government's "predominant

10   reason for . . . denying . . . a press pass was the viewpoint expressed in [the reporter's] writings."

11   *Id.* at *5.  No such evidence is present here.

12   The Plaintiffs have not established the restrictions in the House press pass policy are not

13   viewpoint neutral, and accordingly, Plaintiffs are not likely to prevail on their First Amendment

14   claim.

15       **3.  Washington Free Speech Claim**

16   Though the federal and Washington state constitutions are different "in wording and

17   effect" when it comes to the free speech clauses, Washington courts "have adopted the federal

18   analysis to determine whether a particular class of public property is a traditional public forum

19   under our state constitution." *Sanders v. City of Seattle*, 156 P.3d 874, 879 (Wash. 2007) (en

20   banc); *see also id.* at 880 ("We apply the same standard under article I, section 5 for speech in a

21   nonpublic forum as is applied under the First Amendment.").  Therefore, "[s]peech in nonpublic

22   forums may be restricted if the distinctions drawn are reasonable in light of the purpose served

23   by the forum and are viewpoint neutral." *Id.* (citations and internal quotations omitted).

24

1    Plaintiff cites to the general proposition that the Washington free speech clause is more

2  expansive than its federal counterpart.  (Dkt. No. 2 at 18.)  While this is true generally, *see Ino*

3  *Ino, Inc. v. City of Bellevue*, 937 P.2d 154, 162 (Wash. 1997) (en banc), the Washington

4  Supreme Court's discussion in *Sanders* makes clear that courts should apply the same standards

5  for nonpublic forum analysis as they would in a First Amendment analysis.  156 P.3d at 879–

6  880; *accord. Ino Ino*, 937 P.3d at 162 ("the inquiry must focus on the specific context in which

7  the state constitutional challenge is raised"; "it does not follow that greater protection is provided

8  in all contexts").  Therefore, having found Plaintiff has failed to establish the CCA policy is

9  unreasonable or not viewpoint neutral, *see* Section IV(A)(3)(a)–(b) *supra*, Plaintiffs are equally

10  unlikely to prevail on the merits of their Washington free speech claim.

### 4. Due Process Claim[4]

12    As discussed, bona fide journalists may have a protected liberty interest in obtaining a

13  press pass, and that interest may not be denied without due process.  *Sherill*, 569 F.3d at 130–

14  131.  Due process in this context is satisfied if the House has "some criteria to guide its

15  determinations" as well as "a reasonable way of assessing whether the criteria are met."  *Getty*

16  *Images*, 193 F. Supp. 2d at 121; *see also Alaska Landmine*, 514 F. Supp. 3d at 1132 ("In essence,

17  given the import of First Amendment rights, the government must publicly memorialize the

18  applicable standards to ensure both due process and compelling government interests for any and

19  all denials of access.").  An unsuccessful applicant for a press pass must be given notice of "the

20

21  ───────────────

[4] Though Plaintiffs allege a due process violation under the Washington Constitution in their
22  original complaint and motion for TRO (Dkt. Nos. 1-2 at 16–17; 2 at 19), they acknowledge that
the Washington Due Process Clause "does not afford broader protection than that given by the
23  Fourteenth Amendment."  (Dkt. No. 2 at 20) (citing *State v. Beaver*, 336 P.3d 654, n.14 (Wash.
Ct. App. 2014), *aff'd*, 358 P.3d 385 (2015)).  The Court will therefore focus its analysis on
24  Plaintiffs' due process claim under the United States Constitution.

1    factual bases for denial with an opportunity to rebut . . . [to] ensur[e] that the denial is indeed in

2    furtherance" of the government's interests.  *Sherill*, 569 F.2d at 131.

3            Plaintiffs argue the House violated their due process rights when it denied their press

4    passes for reasons that were "arbitrary and wholly uncompelling," in addition to being vague and

5    inconsistently enforced.  (Dkt. No. 2 at 20.)  They argue they were not given fair notice of the

6    House's decision to deny access, and that the House did not provide them with an opportunity to

7    challenge their denials.  (*Id.* at 21.)  The House contends that the press pass policy provides "a

8    reasonable opportunity to understand eligibility criteria" and that Plaintiffs were clearly provided

9    notice of the factual bases for their pass denials, as well as an opportunity to appeal the decision.

10   (Dkt. No. 13 at 28–29.)

11           Much of the same evidence that supports a finding that the press pass policy is

12   reasonable, *see* Section IV(A)(3)(a) *supra*, weighs in favor of finding that it comports with due

13   process requirements.  The policy explicitly states, among other things, that journalists applying

14   for credentials must be employed by a news organization, work primarily in reporting, and

15   cannot be engaged in campaigns, lobbying, or public policy development.  (Dkt. No. 2 at 37–38.)

16   Though Plaintiffs complain that the policy is not publicly available, it is undisputed that those

17   that requested a copy were provided one.  (*Id.* at 36 (counsel for Hoffman requesting the CCA

18   guidelines); *cf.* Dkt. No. 15 at 7 (Palmer declaring Choe "never requested a copy of the CCA

19   guidelines").)  Case law suggests that the policy does not need to be literally published, as long

20   as it is documented and available upon request.  *See Getty Images*, 193 F. Supp. 2d at 121 ("The

21   sensible way to [assess whether the access requirements are met] and to satisfy the due process

22   concerns implicated by restrictions on First Amendment rights is to publish (i.e., make available

23   to potentially interested parties in writing or otherwise) the criteria used in the [Government]'s

24

selection process[.]"); *Alaska Landmine*, 514 F. Supp. 3d at 1132 ("The overarching principles applied in [*Sherrill* and *Getty Images*] suggest that covert, unwritten policies are per se violations of due process.").

Further, each Plaintiff received notice of the factual basis for their denial, and the House's explanation tied the denial back to the CCA policy.  Hoffman and Kruse were denied passes "[b]ased on [their] recent engagement in public policy development and advocacy," and as stated in the CCA guidelines, "'[i]t is important that a line be established between professional journalism and political or policy work.'"  (Dkt. No. 2 at 55, 67) (citing *id.* at 38).  Choe was denied a pass because he "indicated that [he] represent[ed] the Discovery Institute/Frontlines TPUSA.  As stated in the CCA guidelines, credentials are not provided to individuals who work for any publication or information source that is part of a larger non-news organization; this includes think tanks." (*Id.* at 65.)  Though Plaintiffs argue they were not provided an "opportunity to challenge their access denial[]" (*id.* at 21), the evidence indicates all three plaintiffs availed themselves of an appeal process.  (*See id.* at 50–53 (Hoffman's appeal letter, dated January 29, 2026); *id.* at 59–63 (Choe's denial email providing Clerk's Office contact information for an appeal and Choe's subsequent email appeal); Dkt. No. 14 at 62–66 (Kruse requesting a response in writing after her press pass application was denied).)  Plaintiffs state the denial letters identified no "context or examples" of their disqualifying advocacy work, but they point to no legal authority that supports their position that more detail is constitutionally required.[5]  (Dkt, Nos. 2 at 21; 21 at 14.)

---

[5] The Court does note that the initial denials for at least two of the Plaintiffs were apparently communicated via email with no explanation.  (*See* Dkt. No. 14 at 55, 66.)  The use of an email to deny a press pass with no explanation does raise due process concerns, but *Sherill* is somewhat imprecise as to what due process requires at the front end.  According to *Sherrill*,

Plaintiffs also take issue with the fact they believe they are the only journalists who have been denied press passes and contend they were only denied access because of "perceived viewpoints [on] Plaintiffs' speech." (Dkt. No. 2 at 21–22.) But the House has denied press passes this year to others who did not meet the policy requirements. (*See* Dkt. No. 15 at 7) ("Applicants others than Plaintiffs have been denied press passes under the CCA guidelines during this legislative session."). The House has also provided credentials to journalists from a wide range of news outlets, including another journalist from the same news outlet that employs Hoffman. (Dkt. No. 15 at 5–6); *MacIver Inst.*, 994 F.3d at 611 ("[T]he inclusion of a broad range of media outlets on both sides of the political spectrum certainly diminishes any claim that the list is based on political ideology."). Plaintiffs do not provide evidence to the contrary. The House has therefore established "criteria to guide its determinations[,]" as well as "a reasonable way of assessing whether the criteria are met[,]" by looking to the CCA recommendations. *Getty Images*, 193 F. Supp. 2d at 121. At least one other court has upheld a press pass policy which bases certification on third-party guidelines. *See Ateba*, 133 F.4th at 118 ("Except for two years, the White House has preconditioned hard passes on a journalist's certification by an outside body for over forty years."). Because the House has met its due process obligations as outlined in *Sherill*, 569 F.3d at 130–131, Plaintiffs are unlikely to succeed on the merits of their due process claims.

---

"[w]e think that notice to the unsuccessful applicant and the factual bases for denial with an opportunity to rebut is a minimum prerequisite for ensuring that the denials is indeed in furtherance of [the stated goals], rather than based on arbitrary or less than compelling reasons." 559 F.2d at 131. Here, the entire record establishes that the House ultimately provided the factual bases for denial and an opportunity to rebut. *See id.* ("The requirement of a *final statement of denial* and the reasons therefor is necessary in order to assure that the agency has neither taken additional, undisclosed information into account, nor responded irrationally to matters put forward by way of rebuttal or explanation.") (emphasis added).

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 2) - 25

1        **5.  Non-Delegation Claim**

2        Under the Washington Constitution, "[t]he legislative authority of the state of

3    Washington shall be vested in the legislature[.]"  WASH. CONST. art. II § 1.  Pursuant to this

4    provision, "it is unconstitutional for the Legislature to abdicate or transfer its legislative function

5    to others," *Brower v. State*, 969 P.2d 42, 49 (Wash. 1998), though the legislature "may grant

6    regulatory authority to private parties only if proper standards, guidelines, and procedural

7    safeguards exist."  *Ent. Indus. Coal. v. Tacoma-Pierce Cnty. Health Dep't*, 105 P.3d 985, 988

8    (Wash. 2005) (en banc).

9        Plaintiffs argue the House's delegation of the process of granting and denying press

10   passes violates the non-delegation doctrine because "proper standards, guidelines, and procedural

11   safeguards do not exist to protect Plaintiffs' rights."  (Dkt. No. 2 at 22.)  Citing *Children's*

12   *Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 754 (9th Cir. 2024), Plaintiffs argue

13   Defendants have violated the nondelegation doctrine because the CCA is acting as the House's

14   "proxy" in enforcing and facilitating the press pass process by "influenc[ing] which journalists

15   may access the legislature[.]"  (Dkt. No. 21 at 14–15.)  The House asserts that it has not

16   delegated the authority to grant or deny press passes to the CCA, and that the House alone is

17   responsible for the denial of Plaintiffs' passes.  (Dkt. No. 13 at 30.)

18       As a threshold matter, Plaintiffs do not explain which of the four tests for determining

19   whether a private entity is behaving as a state actor is applicable in this case.  (*See* Dkt. No. 21 at

20   15) (citing *Meta Platforms*, 112 F.4th at 754).  Plaintiffs argue only that "there is more than

21   sufficient evidence to demonstrate that the CCA is acting as the government's proxy in enforcing

22   House rules and facilitating its press pass process."  (*Id.*)  But this one statement fails to identify

23   which test applies in this case.  *See Meta Platforms*, 112 F.4th at 754 ("To satisfy the state actor

24

1    requirement, the party must 'fairly be said to be a state actor' . . . which requires that it meet one

2    of [the] four tests[.]") (citation omitted).  And importantly, "a plaintiff must allege facts

3    supporting an inference that the government 'is *responsible* for the specific conduct of which the

4    plaintiff complains.'"  *Id.* (quoting *Ohno v. Yasuma*, 723 F.3d 984, 994 (9th Cir. 2013)).  Here, it

5    cannot be said that the House required the CCA to create the guidelines that Plaintiffs now

6    complain of; the record suggests the CCA alone was responsible for creating its own guidelines.

7         In any case, the record indicates the House alone is responsible for granting or denying

8    press credentials.  (*See* Dkt. Nos. 14 at 5 ("This legislative session, the House has handled all

9    aspects of the press pass application process, relying on Capitol Correspondents['] Association

10   only to provide recommendations pursuant to its guidelines."); 15 at 2 ("While the CCA makes

11   recommendations to the House with respect to press pass applications, the House approves or

12   denies access.").  Further, the House has "always" handled appeals of press pass denials.  (Dkt.

13   No. 14 at 5.)  Though the House relies "in part" on the CCA guidelines (Dkt. No. 15 at 2), and

14   that reliance is communicated to applicants who are denied press passes, it does not mean the

15   House has impermissibly delegated its authority to the CCA in a way that does not provide

16   "proper standards, guidelines, and procedural safeguards[.]"  *Ent. Indus. Coal.*, 105 P.3d at 988.

17   Plaintiffs are therefore unlikely to succeed on the merits of their nondelegation claim.

18        **B.  Irreparable Harm**

19        The Court next addresses whether Plaintiffs have established a likelihood of irreparable

20   harm.  For purposes of injunctive relief, irreparable harm constitutes "harm for which there is no

21   adequate legal remedy, such as an award of damages."  *Ariz. Dream Act Coal. v. Brewer*, 757

22   F.3d 1053, 1068 (9th Cir. 2014).  The deprivation of First Amendment rights, "for even minimal

23   periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347,

24

1   374 (1976); *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A 'colorable First Amendment

2   claim' is 'irreparable injury sufficient to merit the grant of relief[.]'") (citation omitted).

3   However, "[s]peculative injury does not constitute irreparable injury sufficient to warrant

4   granting a preliminary injunction."  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d

5   668, 674 (9th Cir. 1988).

6          Here, Plaintiffs argue the denial of their press passes and access to the government's

7   activities constitutes a "serious harm[] that must immediately be remedied[.]"  (Dkt. No. 2 at 16.)

8   The House argues any harm suffered by Plaintiffs is not irreparable because their claims to a

9   constitutional violation are speculative and baseless.  (Dkt. No. 13 at 31.)  The House further

10  contends Choe was specifically given the opportunity to reapply for a day pass under his

11  affiliation with the *Lynwood Times*, but he chose not to do so.  (*Id.*; Dkt. No. 15 at 7.)  In reply,

12  Plaintiffs reassert, "[e]very legislative day that Plaintiffs remain excluded from the press areas is

13  a day their constitutional rights are violated."  (Dkt. No. 21 at 16.)

14         The Court is skeptical that Plaintiffs have suffered an irreparable injury that warrants

15  granting a TRO.  First, the Court agrees with the House that Choe's failure to reapply for a press

16  pass using his *Lynwood Times* credentials makes his injury speculative, as it is unclear whether

17  he would have been denied a press pass had he reapplied.  (Dkt. No. 15 at 7); *April in Paris v.*

18  *Becerra*, 494 F. Supp. 3d 756, 769 (E.D. Cal. 2020) (citing *Baldrige*, 844 F.2d at 674) ("A

19  merely speculative injury is insufficient to constitute irreparable injury."). Second, as the Court

20  has identified, the record has not established a colorable First Amendment claim, which leads to

21  the absence of an irreparable injury.

22         It is also important to note that the relief Plaintiffs seek is not narrowly tailored to remedy

23  the alleged harm.  Though district courts have broad discretion to fashion a remedy, *see Sharp v.*

24

1   *Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000), "[i]njunctive relief . . . must be tailored to remedy

2   the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009)

3   (citation omitted). "Where injunctive relief is warranted, the order must be narrowly tailored to

4   'remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible

5   breaches of the law.'" *Gallagher Benefit Servs., Inc. v. De La Torre*, 283 Fed. App'x 543, 546

6   (9th Cir. 2008) (quoting *Price v. City of Stockton,* 390 F.3d 1105, 1117 (9th Cir. 2004) (per

7   curiam) (citation omitted)); *see also Kifle v. YouTube LLC*, Case No. 21-cv-01752-CRB, 2021

8   WL 1530942, at *7 (N.D. Cal. Apr. 19, 2021) (citing *Stormans*, 586 F.3d at 1141) ("If YouTube

9   were engaging in copyright or trademark infringement, the proper remedy would be an order

10  requiring YouTube to take the steps necessary to stop engaging in copyright or trademark

11  infringement. An order that also requires YouTube to restore Kifle's channel would be

12  impermissibly 'overbroad.'"). Further, an injunction against state actors "'must directly address

13  and relate to the constitutional violation itself' . . . and must not 'require more of state officials

14  than is necessary to assure their compliance with the [C]onstitution.'" *Melendres v. Arpaio*, 784

15  F.3d 1254, 1265 (9th Cir. 2015) (citations omitted). An overly broad injunction is an abuse of

16  discretion. *Stormans*, 586 F.3d at 1140 (citation omitted).

17       Here, Plaintiffs were denied daily press passes for January 29 (Hoffman), February 2

18  through 6 (Choe) and February 2 and 6 (Kruse). The record indisputably shows that Plaintiffs

19  applied for press passes on specific dates and did not apply for "hard passes," which are

20  "intended for individuals whose primary reporting location is Olympia and with a legislative

21  focus, who presumably will be onsite often." (Dkt. No. 15 at 3; *see also* Dkt No. 14 at 50–52,

22  58–60, 69–71) (Plaintiffs' press pass applications).

23

24

1    In their motion for TRO, however, Plaintiffs request two types of injunctive relief. First,

2    they request the Court order the House to "immediately rescind the denial of Plaintiff's press

3    passes." (Dkt. No. 2 at 81.) It is unclear what effect, if any, this sort of ruling would have on the

4    current circumstances, in which Plaintiffs were denied press passes on specific dates over a

5    month ago. This type of relief seems ill-suited for a motion for TRO, which inherently deals

6    with ongoing and irreparable harm in the absence of relief. *Winter*, 555 U.S. at 20; *Great N.*

7    *Res., Inc. v. Coba*, Case No. 3:20-cv-01866-IM, 2020 WL 6820793, at *2 (D. Or. Nov. 20, 2020)

8    (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–496 (1974)) ("A preliminary injunction stops

9    ongoing harm to a plaintiff or prevents it from occurring. 'Past exposure to illegal conduct does

10   not in itself show a present case or controversy regarding injunctive relief, [ ] if unaccompanied

11   by any continuing, present adverse effects.'"); *Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 737

12   F. Supp. 2d 1257, 1269 (E.D. Wash. 2010) (finding there was no irreparable harm when the

13   plaintiffs showed evidence of the defendant's past trade secret misappropriation but "no ongoing

14   harm from that misappropriation").

15   Second, at the hearing, Plaintiffs requested the Court order the House to provide them

16   with press passes for the remainder of the legislative session, which runs until March 12, 2026.[6]

17   As of the time of the hearing, Plaintiffs had not applied for press passes other than those

18   previously denied. At the hearing, however, counsel for Plaintiffs asserted that Kruse had

19   applied for a press pass for March 9 through 12 on the Saturday or Sunday prior to the March 9

20   hearing. However, absent in the record is any information regarding Kruse's (or any of the

21

22   _____

     [6] Plaintiffs' reply also appears to suggest the Court should order the House to grant press passes

23   for the remaining legislative session. (Dkt. No. 21 at 16) ("There is no harm to the Defendants in
     granting press passes to Plaintiffs for the remaining roughly 72 hours of session after the hearing

24   on the instant motion.").

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 2) - 30

Plaintiffs') new press pass applications.  And in any case, a press pass application, and

subsequent denial, if there is one, presents new evidence and requires new analysis that the Court

cannot engage in until there has been an actual constitutional injury alleged *on that basis*.  *See*

*Stockton*, 390 F.3d at 1117 ("A preliminary injunction should be used only to maintain the status

quo.").  As counsel for the House pointed out, Plaintiffs essentially ask the Court to permit them

to sidestep the press pass application process entirely and use the judicial process as their

application instead.  The Court is concerned Plaintiffs' requested relief is not narrowly tailored

and requests a remedy outside the "specific harms," i.e., the purported constitutional violations

on January 29 and February 2 through 6, of which they allege they suffered.  *Gallagher*, 283

Fed. App'x at 546 (citation omitted).  Put another way, Plaintiffs' request for press passes they

have not applied for, and have not been denied, sweeps too broadly by asking the Court "'enjoin

[other] possible breaches of the law.'"  *Id.* (citation omitted).

### C.  Public Interest and Balance of Equities

The final two *Winter* factors require the Court to "balance the competing claims of injury

and must consider the effect on each party of the granting or withholding of the requested relief."

555 U.S. at 24.  These factors "merge when the Government is the opposing party."  *Nken*, 556

U.S. at 435.  "Generally, public interest concerns are implicated when a constitutional right has

been violated, because all citizens have a stake in upholding the Constitution."  *Preminger v.*

*Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

Plaintiffs argue the House has no legitimate interest in denying them press passes and that

granting the passes will benefit both parties, because it "fosters popular trust in officials' political

disinterest and their ability to govern fairly and without favoritism."  (Dkt. No. 2 at 23.)  The

House states only that the balance of the equities tilts in its favor because it has a "substantial

interest in preserving the working space of Members on the House floor free of lobbyists." (Dkt. No. 13 at 31.)

The Court acknowledges that both parties have legitimate interests at stake here, but because Plaintiffs have not shown a likelihood of success on the merits on their free press or due process claims, and because the House has a substantial interest in ensuring the reporters it permits to access the House floor meet the credential standards promulgated so the House may "debate and pass laws without interruption or lobbying in that space," these final *Winter* factors are not dispositive. (Dkt. No. 13 at 22.)

## V    CONCLUSION

Having considered Plaintiffs' motion for TRO (Dkt. No. 2), Defendants' responses (Dkt. Nos. 13, 17), Plaintiffs' reply (Dkt. No. 21), and the remainder of the record, Plaintiff's motion is DENIED.

Dated this 10th day of March 2026.

David G. Estudillo
United States District Judge