**HON. DAVID G. ESTUDILLO**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| ARI HOFFMAN, BRANDI KRUSE, and JONATHAN CHOE<br><br>*Plaintiffs*,<br><br>*v.*<br><br>WASHINGTON STATE HOUSE OF REPRESENTATIVES; CHIEF CLERK BERNARD DEAN, in his official capacity; THE LEGISLATURE OF THE STATE OF WASHINGTON; THE STATE OF WASHINGTON; and the WASHINGTON STATE CAPITOL CORRESPONDENTS ASSOCIATION, a Washington State non-profit association.<br><br>*Defendants*. | Case No. 3:26−cv−05214−DGE<br><br>**AMENDED PETITION FOR DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. Thomas Jefferson once wrote that "liberty depends on the freedom of the press, and that cannot be limited without being lost." *See* Letter from Thomas Jefferson to James Currie, Jan. 28, 1786.[1] Over the next two centuries, a free press would play a decisive role in what Jefferson called

[1] Available at https://tjrs.monticello.org/letter/2141#X3184736.

"the course of human events," thwarting wars but also starting them,[2] making and breaking presidencies[3], and bursting market bubbles as readily as they had fed them.[4] The truth is a mixed bag. But it is the *people*, and *not* their public servants, who are their stewards. So, core is this principle, it is little wonder we Americans are so innate to even the most marginal attempts to curtail it. President John F. Kennedy said it best: "A nation that is afraid to let its people judge the truth and falsehood in an open market is a nation that is afraid of its people." John F. Kennedy, *Public Papers of the Presidents of the United States: John F. Kennedy* 163 (1962). At first glance, the injuries Defendants inflicted on Plaintiffs could seem marginal at best. Apologists might point to the presence of other reporters as proof, missing the obvious point that those reporters might self-censor what they report and *how* they report it for fear of losing access.

2. This past legislative session, Defendants broke the public's trust when they successfully conspired to deny Plaintiffs access other reporters were granted without issue. As detailed herein, Defendants did this for no good reason—based, instead, on arbitrary, capricious, and irrelevant factors that have no bearing on any compelling—or, frankly, even plausible—governmental interest. The criteria Defendants used, if any, remains opaque. Responsive emails Plaintiffs obtained from Defendants' agents only after repeated efforts indicate that they came from a set of what were at the time unpublished guidelines promulgated by the obscure "Washington State Capitol Correspondents Association" ("CCA").

3. Defendants' specious excuse for the denials is that because Plaintiffs interpret policymaking they therefore fatally compromise Plaintiffs' journalistic independence—putting

---

[2] *Compare generally* Daniel Ellsberg, *Secrets: A Memoir of Vietnam and the Pentagon Papers* (2002) to Evan Thomas, *The War Lovers: Roosevelt, Lodge, Hearst and the Rush to Empire, 1898*.
[3] *See generally* John W. Tebbel & Sarah M. Watts, *The Press and the Presidency: From George Washington to Ronald Reagan* (1985).
[4] *See generally* Andrew Ross Sorkin, *Too Big to Fail: The Inside Story of How Wall Street and Washington Fought to Save the Financial System—and Themselves* (2009).

aside, for the moment, the ludicrous notion that opinion journalism is any less deserving of the most robust constitutional protection.

4. The guidelines Defendants cited, *ex ante*, as grounds for denial are more than merely vague and unenforceable in their own right. Defendants also quite clearly used them against Plaintiffs in a manner impermissibly distinct from their application to other members of the press—if the latter were even subject to them at all.

5. The manner of the denial also violated Plaintiffs' constitutional right to due process. While the letter indicated that Mr. Hoffman could appeal the decision, it was silent with respect to timeline, process, standard of review or appropriate grounds for appeal.

6. This Petition is timelier than ever and the injuries described here are capable of repetition. What "counts" as truth has everywhere become a contest of wills. As Justice Brandeis famously noted, "[s]unlight is said to be the best of disinfectants; electric light the most efficient policeman."[5] Washingtonians share the same right as other Americans to draw the curtain of knowledge as far back as the integrity of its frame allows.

7. In a nutshell, Plaintiffs are treated as journalists for the purposes of accessing the Washington State Senate, the House Republican wings, and media availabilities in both the House and Senate, as well as the Governor's Office, but are not journalist *enough* to be allowed day passes to access a small table on the floor of the House where their professional peers are permitted to watch proceedings and observe the House majority wings. This is the textbook definition of an arbitrary and capricious distinction in violation of the First Amendment.

8. Defendants' press pass scheme violated Plaintiffs' federal and state constitutional rights as follows:

[5] Louis D. Brandeis, "What Publicity Can Do," in *Other People's Money and How the Bankers Use It* (1914).

- Defendants' denials were made without sufficient explanation to overcome the presumption that these decisions were reached based on arbitrary and/or capricious criteria in violation of Plaintiffs' speech, press, due-process, and equal-protection rights, among others, and were not applied in either a uniform or consistent manner.
- The Guidelines maintained by the CCA and relied upon by the House are vague, ambiguous, and therefore unenforceable, and were unpublished until after this litigation commenced.
- Defendants applied the Guidelines against Plaintiffs without any plausible compelling governmental interest in doing so.
- Defendants denied Plaintiffs access to a limited public forum based upon impermissible viewpoint-based discrimination.
- The initial and appealed denials lacked even the most rudimentary guardrails for due process, with Plaintiffs deprived of proper notice, an opportunity to be heard, and given no written explanation for the denials.
- The Guidelines are neither reasonable nor viewpoint neutral. It is no coincidence that Plaintiffs are all members of the press who have been critical of the House of Representatives. Ms. Kruse and Mr. Choe have criticized House leadership's support for legislation such as the income tax in SB 6346 and expressed support for initiatives pending on the upcoming ballot that did not receive hearings in the House of Representatives. Mr. Choe has openly criticized the Legislature's approach to homelessness. The denial of day passes to these members of the press based on their affiliations with "advocacy" groups that take positions on "policy" is essentially

retaliation for Plaintiffs' public positions and political commentary and demonstrates that the Guidelines are not viewpoint neutral in either content or application.

## II. PARTIES

9. Ari Hoffman is a reporter residing and operating in the State of Washington. Hoffman broadcasts on AM 570 KVI and has produced journalistic content for broadcast, print, and digital media, including Newsweek, Fox News, Newsmax, The Post Millennial and Human Events.

10. Brandi Kruse is a reporter residing and operating in the State of Washington. Kruse hosts the unDivided podcast and previously worked as a television journalist for Fox 13 Seattle.

11. Jonathan Choe is a reporter residing and operating in the State of Washington. Choe is a reporter with the news site www.fixhomelessness.org and is a Senior Fellow with the Discovery Institute's news branch. He regularly produces journalistic content for national broadcast networks, including ABC, NBC, FOX, and CBS. He is also the Seattle bureau reporter for cable channel Newsmax and is the lead investigative reporter for Frontlines TPUSA. He is also a regular contributor to The Lynnwood Times.

12. The Washington State House of Representatives ("House of Representatives") is a legislative body in the State of Washington.

13. Chief Clerk Bernard Dean ("Chief Clerk Dean") is the Chief Clerk of the Washington State House of Representatives.

14. The Washington State Legislature ("the Legislature") is the legislative branch of government for the State of Washington.

15. The State of Washington is a state in the United States of America and is subject to its own Constitution and the U.S. Constitution.

16. The Washington State Capitol Correspondents Association is a non-profit association comprised of some members of the media in Washington State. Jerry Cornfield is a representative of the CCA. The CCA produces "Guidelines" which are relied upon, "in part," by other Defendants in this litigation in deciding whether to approve press passes for reporters and other journalists who apply. In addition, the CCA, through its representative, actively questions potential applicants regarding whether they comply with the Guidelines and, by its own admission, makes recommendations to the House of Representatives as to whether an applicant should be granted a pass, thereby actively creating and enforcing House credentialing policy. The CCA therefore acts in place of the State Defendants insofar as the latter have delegated their credentialing authority to the former.

17. Because of the pervasive entwinement of CCA's credentialing function with the House's legislative-access regime—CCA is a state actor for purposes of the First and Fourteenth Amendments and 42 U.S.C. § 1983. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–98, 302 (2000); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) ("The joint action test asks, 'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'") (internal citations omitted).

## III. <u>JURISDICTION, VENUE, AND STANDING</u>

18. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because Plaintiffs' federal claims arise under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983; under 28 U.S.C. § 1343(a)(3) and (a)(4), because this is a civil action for the redress of the deprivation, under color of state law, of rights secured by the Constitution and federal law and to recover damages and equitable relief therefor; under 28 U.S.C. §§ 2201 and

2202, which authorize the Court to declare the rights and other legal relations of the parties and to grant any further necessary or proper relief; and under 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over Plaintiffs' state-law claims because they form part of the same case or controversy.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). All Defendants reside in this District for venue purposes, and a substantial part of the events and omissions giving rise to the claims occurred in this District. The case was originally filed in Thurston County Superior Court on February 10, 2026, and removed to this Court on March 2, 2026. Defendants' have waved any Eleventh Amendment protections by removing this case to this Court.

20. Plaintiffs have standing to bring this action because they are reporters engaged in professional news or other information gathering activities and Defendants have denied them access to lawmakers and the legislative process, in violation of their constitutional, statutory, and/or equitable rights.

21. Plaintiffs have suffered constitutional, statutory, and other harms as a result of Defendants' arbitrary denial of their requests for "press passes" readily granted to others in their field, and which in the context of their work is essential to their operation as reporters, newsgatherers, and, crucially, watchdogs for the public.

22. As a result, Plaintiffs directly sustained injuries-in-fact which are redressable through damages but also through declaratory and injunctive relief. Specifically, Plaintiffs have every intention to apply for press passes next legislative session, and absent the Court's intervention as requested, Defendants will almost certainly continue to deny them on the same or similar unconstitutional, illegal, inequitable, arbitrary, and capricious bases. In addition, Plaintiffs have suffered nominal damages every day they were unconstitutionally denied press passes.

23. This case is of the greatest public importance. Ultimately, all Washingtonians will suffer the consequences of obstructed access to the inner workings of their government, where Plaintiffs play a critical role in informing the public.

24. Defendants (1) Washington State House of Representatives; (2) Chief Clerk Bernard Dean; (3) Washington State Legislature; (4) State of Washington; and (5) Washington State Capitol Correspondents Association are all properly included as parties herein.

25. While the 2026 legislative session adjourned on March 12, 2026, this remains a live case or controversy. The Guidelines that produced the denials at issue remain in force; the House's credentialing process for the 2027 session will be governed by the same standards and the same gatekeepers; and Plaintiffs each intend to apply for House floor press pass credentials for the 2027 session and every session thereafter for so long as they continue to pursue their work in Washington State. This case presents the paradigmatic scenario that is capable of repetition—a legislative session is too short to permit full litigation of credentialing disputes to final judgment, and Plaintiffs are reasonably likely to be subjected to the same conduct again. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (confirming Article III jurisdiction despite end of relevant contract period "because the same legal issue in this case is likely to recur in future controversies between the same parties . . ."); *Spencer v. Kenma*, 523 U.S. 1, 17 (2007) ([T]he capable-of-repetition doctrine applies only in exceptional situations where the following two circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.") (cleaned up) (internal quotes and citations omitted).



CITIZEN ACTION DEFENSE FUND

26. The Court's March 10, 2026, denial of a temporary restraining order was a denial of preliminary relief on the "likelihood of success" standard tied to the closing 72 hours of the 2026 session; it does not foreclose plenary adjudication of these claims on a developed record. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.") (internal citations omitted).

## IV. STATEMENT OF FACTS

### A. WASHINGTON STATE LEGISLATIVE SESSION OF 2025

27. Under Washington House of Representatives Rule 8, adopted in 2025, representatives of the press may have access to the chambers.

28. For well over the last 50 years, press credentialing at the Legislature has been coordinated by the CCA. However, in 2025 that role changed. Decl. of Jackson Maynard, Ex. A, Letter to Jerry Cornfield, Representative of the CCA dated February 19, 2025.Following the denial of several press passes by the Washington State Senate during the 2025 session, including those of Jonathan Choe and Brandi Kruse, a letter was sent to the CCA outlining the constitutional defects of the process used to determine how press passes would be approved. *Id*.

29. Following receipt of the letter, Chief Clerk Dean sent an email that indicated that the CCA would be relinquishing that role and asked that press credentialing be handled directly by the Legislature. Decl. of Jackson Maynard, Ex. B, Email from Chief Clerk Dean dated March 20, 2025.

30. The Senate eventually issued press passes to the reporters who were the subject of the February 19 letter, including Jonathan Choe and Brandi Kruse.

**B. THE HOUSE'S PRESS PASS SCHEME OF 2026**

31. Subsequently, the House of Representatives concocted a new scheme ("press pass scheme") for the 2026 session to provide for press passes to representatives of the press.

32. Members of the press are required to obtain a press pass and must apply via a form on the House of Representatives website.[6]

33. There are two types of passes: a hard pass for members of the press who primarily work on the capitol campus during session, and a day pass for all others.

34. To receive a press pass to the House floor, an individual must complete and submit the House Press Pass Agreement, which requires the individual applicant to provide contact information for themselves and their organization.

35. According to the online application form, the House will issue floor press passes to individuals who meet CCA Guidelines ("Guidelines"), informed by CCA recommendations.

36. When this litigation commenced, the online form stated that "Guidelines are available upon request" but did not provide any link thereto. It was only after the start of this lawsuit that someone with access to the webpage deleted this sentence and replaced it with an active hyperlink to the guidelines. Defendants' subsequent change casts doubt on the propriety of the original form of "notice" offered.

37. Further, the form refers to CCA Guidelines as "House Guidelines," suggesting that the House has *de facto* adopted the CCA Guidelines. It also on at least one occasion indicates the opposite. On the webpage, the "House Guidelines" also refers to those "below"—that is, the several attestations before the signature line. So, there are "House Guidelines" referring to the "CCA Guidelines" but also "House Guidelines" referring to guidance that are not the "CCA

---

[6] *House of Representatives Floor Press Pass Request Form*, https://form.jotform.com/253207367883061 (last accessed May 2, 2026).

Guidelines." This only compounds the reasonable applicants' confusion and adds to the vague and ambiguous nature of the process.

38. The House's confirmed endorsement of the CCA Guidelines in the first stage of this litigation indicates it has also adopted them *de jure*.

39. Undersigned counsel made a public-records request for the "Guidelines" referenced on the form and used to determine issuance of press passes. In response, counsel received a copy of the CCA Guidelines. Decl. of Jackson Maynard, Comp. Ex. C, Communications on Guidelines for Washington State Legislature Press Credentials.

40. As applicants, Defendants agreed to abide by the House rules of decorum and the Legislative Code of Conduct. Evidently, they were also required to meet certain CCA Guidelines, outlined below, but under conditions still not entirely clear. *Only* upon request for approval were Defendants cautioned that failure to follow these directives may result in immediate revocation of a press pass. Until this litigation, the Guidelines were not publicly available or published and could only be obtained upon individual request. Decl. of Jackson Maynard, Comp. Ex. C, Communications Re: and Guidelines for Washington State Legislature Press Credentials.

41. Further, the Guidelines are framed as aspirational recommendations and are not binding or determinative of who is entitled to a press pass. For example, it is unclear if "press credentials"—a term used in the Guidelines—are the "press passes" referenced in the House's jot form application.

42. Under Guideline II, credentials are issued only to "professional journalists." This is defined as "reporting or shooting [as] part of your primary job and that job is the source of most of your income."

43. The reason for this is given in Guideline III:

> *The Association recommendations are guided by this principle: The press must be independent from the government and from the political parties, their constituent groups, and the many organizations which have a stake in the Legislature's proceedings. Blurring that line would raise questions about the motives of everyone in the press corps, and risk having the Legislature revoke or restrict the access we have maintained in the public interest for many years.*

44. Guideline IV, however, requires that an applicant's employer be a news organization, "full stop." While the phrase "news organization" is undefined, the Guidelines indicate that the CCA does not support "providing credentials to people who work for any publication or information source that is *part* of a larger non-news organization. The entity must be doing news *for the sake of news alone*."

45. On this, Guideline V is worth quoting at length:

> *The Association will not support the providing of a credential to a person who is or may become engaged in campaigns, lobbying, or the development of public policy. Giving a relatively inconsequential amount of money to some organization probably is not enough to trigger this rule. Anything beyond that probably is.*
>
> *It is important that a line be established between professional journalism and political or policy work. This is the spirit in which the Legislature has offered access: The press should act as an independent observer and monitor of the proceedings, not an involved party.*
>
> *This means that we cannot endorse offering credentials to one who is part of, or may become involved with, a party, campaign or lobbying organization. We also can't support providing a credential to folks who do any sort of consulting, advising, writing, or other work, whether paid or unpaid, for a politician, public official, party organization, lobbying shop, etc. The disqualification also is retroactive: If someone is credentialed and then becomes involved in such activities, the Association would recommend the credential be invalidated.*
>
> *In some cases, professional journalists have crossed back and forth between being a journalist and being involved in political work. Some even have run for office. Since credentials must be renewed with each legislative session, an assessment of a credential-seeker's current or potential political involvement will be undertaken each year – meaning that someone might qualify for a press credential one year, but not the following, depending on their outside activities.*

46. Guideline V outlined above is regularly flouted. Members of the press are "part of" the Washington Newspaper Publisher Association. In 2025, members of the association and its lobbyist testified in support of a bill that would provide funding for local journalists. Decl. of Jackson Maynard, Ex. D, Emails from the Washington Newspaper Publisher Association advocating for S.S.B. 5400. *See also* https://wnpa.com/our-work/advocacy/#support-ssb-5400 (last accessed May 11, 2026) and https://tvw.org/video/senate-labor-commerce-2025011509/? (last accessed July 22, 2026).

47. The CCA Guidelines are not limited to an individual applicant's activities; they also apply to applicants who work for an entity "founded, funded, or affiliated with lobbyists . . . ." Dec. of Jackson Maynard, Ex. C.

48. Because State Defendants admit that they issued press passes to reporters with The Seattle Times, an entity that is at minimum affiliated with lobbyists, those reporters should have also been denied press passes under Defendants' reasoning, but they were not.

49. The ambiguity is in determining who is "engaged in" or "part of" campaigns, lobbying, or the development of public policy. Several prominent news organizations have testified in favor of pending legislation and have editorial pages that support or oppose political candidates and policies. Under the reasoning employed by the Defendants multiple reporters employed by these organizations that are "affiliated with" lobbyists are "part of" or "engaged in" political or lobbying activities should have been denied press passes but were not. The lack of clarity in these provisions invites arbitrary enforcement which is constitutionally impermissible.

***Other Reporters and Their Outlets Routinely "Engage" in the Same Activities Defendants Cited Against Plaintiffs***

50. Defendants denied Plaintiffs press credentials on the basis of their alleged "recent engagement in public policy development and advocacy" (Hoffman, Kruse) or affiliation with a

"publication or information source that is part of a larger non-news organization" (Choe). By those metrics, others in the credentialed press corps are also disqualified.

51. In 2025, members of the press testified in support of SSB 5400, a bill the press itself stood to benefit from financially. Yet several reporters from those organizations hold House press credentials. Defendants' only stated rationale for distinguishing them from Plaintiffs is that the credential-holders' "editorial pages" are housed under a different branch of its corporate umbrella, whereas Plaintiffs' commentary is through the same channels as their reporting. That is a distinction without a constitutional difference.

52. The Washington Newspaper Publishers Association ("WNPA"), whose member newspapers' reporters routinely receive House floor credentials, openly engages in legislative advocacy on its members' behalf. In a February 5, 2026, newsletter, WNPA expressly urged readers to "[c]ontact your legislators" to support SSB 5400 and to "press the Senate Ways and Means Committee to remove Section 26 from SB 6113," supplying both legislator contact lists and direct copy-and-paste advocacy text. Decl. of Jackson Maynard, Ex. D. WNPA describes its newsletter not as journalism but as "advocacy." *Id.*

53. The Seattle Times editorial board regularly endorses candidates for office and advocates for and against specific legislation. So do the editorial boards of every major Washington newspaper whose reporters hold House floor passes. The application of the Guidelines to Plaintiffs—but not to those credentialed reporters—cannot be reconciled with viewpoint neutrality.

54. The State Senate, applying its own credentialing process to the same applicants, granted credentials to Plaintiffs Choe and Kruse as it did to other journalists, several of them from outlets that engage in advocacy of all kinds. In 2025, it issued a Senate press pass to Choe (representing

The Lynnwood Times) and to Kruse. CCA Ans. at 4 (¶19); State Defs. Ans. at 4 (¶19). The same conduct that disqualified Plaintiffs in the House did not disqualify them in the Senate, demonstrating that the Guidelines are incapable of uniform application.

### C. Defendants Deny Plaintiffs' Requests for Press Passes

***Plaintiff Hoffman's Denial***

55. Ari Hoffman is a professional reporter. Reporting is part of his primary job which is the source of most of his income. He is employed by a news organization. He does provide editorial political opinion in his work but does not engage in campaigns, lobbying, or in the development of public policy. Decl. of Ari Hoffman.

56. On Monday, January 26, 2026, Ari Hoffman completed the online form for a daily press pass for January 29, 2026.

57. On January 28, 2026, Ari Hoffman was denied a press pass. Decl. of Jackson Maynard, Ex. E, Letter from Chief Clerk Dean on Hoffman Denial.

58. Chief Clerk Dean's letter noted that he was being denied because the House looks to the CCA to make a recommendation as to whether a press pass applicant is a "bona fide journalist" or not. The letter indicated that *"[b]ased on [his] recent engagement with public policy development and advocacy, [his] request for a press pass is denied."*

59. Apparently, the Guidelines were not the final factor in determining if Hoffman's application would be granted. In the January 28 letter, Chief Clerk Dean stated that the decision was due "in part" to the Guidelines.

60. The Guidelines do not indicate that the CCA will make recommendations on press passes and neither the phrase "bona fide journalist" nor a definition thereof is included therein.

61. Either the House of Representatives has delegated who gets access to its chambers to the CCA—which itself violates the non-delegation doctrine—or has instead decided, of its own accord, to deny Mr. Hoffman a press pass based upon what are, at best, vague recommendations disguised as internally incoherent Guidelines. In either case, the denial constitutes an impermissible violation of Mr. Hoffman's free-speech and free-press rights.

62. On January 29, 2026, undersigned counsel sent a letter to House Speaker Laurie Jinkins, Chief Clerk Dean, and CCA representative Jerry Cornfield. Decl. of Jackson Maynard, Ex. F, Letter from Counsel on Hoffman Denial. The letter outlined legal concerns with the process and decision-making involved in denying Mr. Hoffman's press pass and appealed the denial as well as requested public records regarding the denial.

63. On February 3, 2026, the Chief Clerk denied Mr. Hoffman's appeal. Decl. of Jackson Maynard, Ex. G, Letter from Chief Clerk Dean Responding to Counsel's January 29, 2026, Letter.

64. When Mr. Hoffman's application was pending, producer asked for a day pass and received a call from Jerry Cornfield, representative of the CCA, in which he was asked several questions. He received a day pass despite not actually working as a member of the press and his affiliation with many of the same groups and organizations with which Mr. Hoffman is affiliated. Decl. of Ari Hoffman.

65. Mr. Hoffman's wife, Jessica Russak-Hoffman, who is also a reporter, applied for a day pass. She also received a call from Jerry Cornfield, representative of the CCA, who asked her questions concerning her husband not her activities. Following this conversation and a follow up with Mr. Cornfield she also received a day pass. Decl. of Jessica Russak-Hoffman.

66. The interactions described above demonstrate not only the active role the CCA played in vetting applicants and enforcement of the Guidelines but also the vague, arbitrary and capricious nature of the Guidelines and their enforcement.

***Plaintiff Choe's Denial***

67. Jonathan Choe is a professional reporter, and reporting is part of his primary job which is the source of most of his income. He is employed by a news organization. He does provide editorial political opinion in his work but does not engage in campaigns, lobbying, or in the development of public policy. Decl. of Jonathan Choe.

68. On February 2, 2026, Jonathan Choe applied for a press pass for February 2, 3, 4, 5, and 6, 2026. *Id*.

69. On that same date, Mr. Choe's application for a press pass was likewise denied by email which did not contain any reason for the denial. The email did provide an email address for Mr. Choe to appeal in writing.

70. Mr. Choe requested a reason for the denial. The response was that "[a]pprovals and denials are based on [CCA] recommendations and may be appealed by contacting the Chief Clerk's Office in writing." Decl. of Jackson Maynard, Ex. H, Communication between Mr. Choe and Chief Clerk's Office.

71. This response was defective as it did not list any of the "Guidelines" that Mr. Choe had ostensibly failed to meet. It also did not include any explanation for the decision.

72. Mr. Choe appealed via email and that appeal was denied on February 4, 2026.

73. In the February 4, 2026, letter denying Mr. Choe's appeal, Chief Clerk Dean stated that it was because "credentials are not provided to individuals who work for any publication or

information source that is part of a larger non-news organization; this includes think tanks." Decl. of Jackson Maynard, Ex. I, Letter from Bernard Dean on Choe Appeal Denial.

74. Mr. Choe works for and provides newsgathering activities for a number of news outlets including for a web based independent news site covering homelessness and drug addiction in Washington State. https://fixhomelessness.org (last accessed May 2, 2026).

75. Choe was previously granted Senate access through his affiliation with the Lynnwood Times—which also has an editorial page that includes advocacy opinion. In February 2026 Clerk Dean indicated that Choe should apply through this affiliation specifically. Decl. of Jackson Maynard, Ex. H. That Mr. Choe could not be deemed a member of the press for the purposes of his affiliation with the Discovery Institute but sufficiently a member of the press because of his affiliation with the Lynnwood Times further demonstrates the vague, arbitrary, and capricious of the Guidelines and their enforcement.

76. One irony is that when Mr. Choe applied for a day pass in February, Mario Lotmore with Lynnwood Times also applied for a day pass and was initially denied. After Mr. Cornfield, representative of the CCA, exchanged emails with Mr. Lotmore inquiring about his qualifications under the Guidelines, his pass was eventually approved. Decl. of Jackson Maynard, Exhibit K.

77. That Mr. Lotmore was initially denied while attempting to represent The Lynnwood Times, at approximately the same time Mr. Choe was being told to reapply under The Lynnwood Times banner, demonstrates not only the CCA's active role in vetting applicants and enforcing the Guidelines, but also the vague, arbitrary, and capricious nature of the Guidelines and their enforcement.

***Plaintiff Kruse's Denial***

78. Brandi Kruse is a professional reporter, and reporting is part of her primary job which is the source of most of her income. She is employed by a news organization. She does provide editorial political opinions in her work but is not employed in campaigns and does not have any formal role in campaigns, lobbying, or in the development of public policy beyond making .personal donations to particular candidates and attending and speaking at events. Decl. of Brandi Kruse.

79. Ms. Kruse also applied for a day pass. The request was denied. She also appealed. On February 4, 2026, her appeal was denied. Decl. of Jackson Maynard, Ex. J, Letter from Chief Clerk Dean on Kruse Denial. The letter to Ms. Kruse is nearly verbatim to the one sent to Mr. Hoffman. She was denied because the House looks to the CCA to make a recommendation as to whether a press pass applicant is a "bona fide journalist." The letter stated that "[b]ased on your recent engagement with public policy development and advocacy, your request for a press pass is denied."

80. Ms. Kruse responded to the letter via email as follows: "Hello, The letter states I have worked on public policy development. I have not worked on public policy development. Can you provide precise information?... In regard to advocacy, does this mean any individual who has taken a position on policy may not be granted a press pass? The Seattle Times editorial board?" Decl. of Brandi Kruse, Ex. A.

81. The Guidelines do not indicate whether the CCA will make recommendations as to press passes and neither the phrase "bona fide journalist" nor a definition thereof is included therein.

82. Either the House of Representatives has delegated who gets access to its chambers to the CCA, which violates the non-delegation doctrine, or it made the decision to deny Ms. Kruse's pass

based upon vague, unclear, and inconsistently applied recommendations disguised as "Guidelines." Either way, the denial violated Ms. Kruse's right to exercise her freedoms of speech and press.

83. Even though Ms. Kruse's email was treated as an appeal and thusly denied, note that the House did not at any time provide any timeline, process, standard of review or appropriate grounds for appeal, as is required for due-process purposes and under the non-delegation doctrine.

84. Ms. Kruse applied for another day pass in the last few days of session. Her request was denied. Decl. of Brandi Kruse, Ex. B.

***Defendants' Admissions Establishing Joint Conduct and CCA's State-Actor Status***

85. Although CCA is nominally a private association, State Defendants and CCA have together fashioned, administered, and applied the press-credentialing regime at issue here.

86. State Defendants admit that "the press pass guidelines were initially drafted by the CCA," State Defs. Ans. at 2, and that "the House of Representatives relies on the CCA Guidelines, in part, for use in assessing press pass applications." *Id.* at 3 (¶8). State Defendants further admit that "for the last 50 years the CCA has reviewed and recommended responses to press pass applications." *Id.* at 4 (¶16).

87. CCA, for its part, admits that it "has developed guidelines for issuance of press passes permitting access to legislative chambers during floor sessions, and that the other Defendants relied in part on CCA Guidelines in deciding whether to approve press passes in 2026." CCA Ans. at 2 (¶8). CCA further admits that "prior to this year, CCA handled the initial vetting of applications for press credentials," but "CCA's role changed in 2025 after Plaintiffs Kruse and Choe threatened to sue CCA." *Id.* at 3 (¶ 16).

88. The House's own application form—hosted on the Legislature's official website—states that "[t]he House will issue floor press passes to individuals that meet the Capitol Correspondents Association (CCA) guidelines, informed by CCA recommendations." *Id.* at 4 (¶23).

89. In their first paragraph, the Guidelines themselves declare that "[i]ssuing press credentials is subject to the direction and control of the administrations of the Senate and House." Comp. Ex. C, Communications on Guidelines for Washington State Legislature Press Credentials.

90. CCA does not claim—and could not—independent authority over House floor access. The Guidelines are an instrument the House has elected to use; CCA describes them as such on their face.

91. Each denial letter Chief Clerk Dean issued to the three Plaintiffs states that "[t]he House, in part, looks to the Capitol Correspondents' Association (CCA) to make recommendations regarding whether a press pass applicant is a bona fide journalist or not," and bases the denial on the CCA recommendation. *See* Decl. of Jackson Maynard Ex. E, I, and J.

92. Notably, the phrase "bona fide journalist" appears nowhere in the Guidelines themselves; CCA admits this. CCA Ans. at 6 (¶40). The phrase is therefore one Defendants jointly developed and jointly applied as the operative gatekeeping concept.

93. After CCA briefly "relinquished" its formal role in March 2025 in response to the prospect of legal challenge, Chief Clerk Dean wrote that the "CCA has relinquished that role and asked that press credentialing be handled directly by the Legislature." Ex. B (Dean Email of Mar. 20, 2025). What followed was not separation. By November 2025, CCA had resumed its central role, and by early 2026, the House had again incorporated "CCA recommendations" as a determinative factor. The locus of the credentialing function never changed hands.

## V. CLAIMS

### CLAIM I: VIOLATION OF RIGHTS TO FREE SPEECH AND PRESS (FEDERAL)

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

94. Plaintiffs bring this Claim against all Defendants under 42 U.S.C. §1983. Each Defendant acted under color of state law. State Defendants are arms or officers of the State of Washington. CCA acted under color of state law because, as set forth below, it has been pervasively entwined with the House's credentialing function for over fifty years; it has acted jointly with State Defendants in developing and applying the credentialing standards at issue; and the credentialing function it performs is one that the House's rules of access otherwise reserved to legislative officers. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2000) (state action found where there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself") (internal quotes and citation omitted); *Id.* at 298 (entwinement may convert private action to state action by reason of the "pervasive entwinement of public institutions and public officials in [the subject's] composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it"); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) (joint action with state actors is sufficient to render a private party as a state actor); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (surveying four Ninth Circuit tests, including joint action and pervasive entwinement).

95. The First Amendment of the U.S. Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition

the Government for a redress of grievances." The Free Speech and Press Clauses are applied against the states via the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

96. As courts across the nation have long affirmed, "newsgathering is an activity protected by the First Amendment*," United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978), which includes the "right of access for the press and public to observe government activities," *Leigh v. Salazar*, 677 F.3d 892, 897–98 (9th Cir. 2012).

97. The U.S. Supreme Court has acknowledged that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). The Bill of Rights prohibits the government from in any way "abridg[ing] the freedom of the press." U.S. Const. Amend. I. In other words, it is the institution of the press that is the target of protection, due to its vital service to the citizenry. *See* Letter from Thomas Jefferson, *supra*.

98. Based on the importance of the free press and the corresponding individual and collective right to access to lawmaking forums, courts routinely strike down restrictions used to deny press passes and/or credentials to reporters that are based on unclear, spurious, or conflicting grounds. Any restrictions on the issuance of press passes and their specific requirements must be published and cannot be based on vague claims regarding "security" concerns or ambiguous criteria. *See Sherrill v. Knight,* 569 F.2d 124, 130 (D.C. Cir. 1977).

99. Recent federal authority confirms that credentialing schemes conferring standardless discretion or singling out disfavored speakers are unconstitutional. *See Karem v. Trump*, 960 F.3d 656, 664–65 (D.C. Cir. 2020) (affirming preliminary injunction against the suspension of White House hard pass; absence of "explicit and meaningful standard" for sanctioning a credentialed reporter violated due process). *See also Associated Press v. Budowich*, 780 F.Supp.3d 32 (D.D.C. Apr. 8, 2025), stayed pending appeal 2025 WL 2047025 (D.C. Cir. July 22, 2025) (holding that

where a government opens its press facilities to some journalists, it cannot then exclude others on the basis of their viewpoints, and that this rule applies in nonpublic as well as public forums).

100. The constitutional infirmities of Defendants' credentialing scheme are analogous to those struck in a very recent case on Pentagon access, pending appeal. In *N.Y. Times Co. v. Dep't of Def.*, 82 F.Supp.3d 27 (D.D.C. Mar. 20, 2026), the court, on cross-motions for summary judgment, held that a press-credentialing policy authorizing denial, suspension, or revocation of credentials based on the substance of a journalist's reporting violated both the First Amendment and the Due Process Clause of the Fifth Amendment. The court found that the policy (i) effected viewpoint discrimination by operating to exclude disfavored journalists in favor of those willing to publish only government-approved coverage; (ii) vested credentialing officials with unbridled discretion unguided by objective, workable standards; and (iii) failed to provide fair notice of what routine, lawful journalistic conduct would result in loss of access.

101. When the Defense Department subsequently issued a revised "interim" policy that retained the operative restrictions in modified form, the same court enjoined the revised policy as well, holding that an agency may not reinstate the substance of an enjoined access rule under the guise of new action. *Id.* (D.D.C. Apr. 9, 2026).

102. These holdings are in line with the Supreme Court's view that "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). The threat of prior restraint should a government agent use their discretionary powers to censor speech is one of the "identifiable risks to free expression that can be effectively alleviate[d] only through a facial challenge." *Id.*

103. The Guidelines empower Defendants to deny credentials based on what an applicant might do in the future—the very kind of unbridled discretion *Lakewood* prohibited.

104. Moreover, in denying press passes to Mr. Hoffman and Ms. Kruse based on their unpaid "advocacy" in support of initiatives or Mr. Choe based on his work as a member of the press on behalf of a policy organization with which the leadership of the House of Representatives disagrees, the state Defendants are engaged in viewpoint discrimination. If the government opens government property to the press, it cannot deny access to *some* based on their views. *TGP Commc'ns, LLC v. Sellers,* No. 22-16826, 2022 WL 17484331, at *6 (9th Cir. Dec. 5, 2022) (unpublished) ("While reporters do not have an unrestricted right to go where they please in search of news, the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation." (citation modified)).

105. Moreover, restrictions cannot be imposed on the tenuous grounds that a reporter is simply a part-time "blogger," s*ee Dunleavy*, *supra*, 514 F.Supp. 3d at 1134, or that they "take sides, especially in political contests." *See Borreca v. Fasi,* 369 F.Supp. 906, 910 (D. Haw. 1974); *TGP Commc'ns, LLC v. Sellers*, 2022 WL 17484331, at *4 (9th Cir. 2022) (enjoining the restriction of a press pass, which relied on claim that the reporter "participate[d] in political party events and associate[d] with people and groups that demonstrate an inability to avoid real or perceived conflicts of interest"). Such viewpoint-based restrictions violate core First Amendment rights, and there is no compelling government interest in avoiding criticism from reporters or commentators who they wish to avoid. *Id*.

106. At least one federal court understands the U.S. Supreme Court's scrutiny on such questions that even "[f]or a nonpublic forum, the question is whether the restrictions are (1)

reasonable and (2) not an effort to suppress an opposing viewpoint." *See John K. MacIver Inst. for Pub. Policy v. Evers*, No. 19-CV-649-JDP, 2020 WL1531637, at *5 (W.D. Wis. Mar. 31, 2020) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)).

107. Finally, Defendants' failure to publish the Guidelines during the period Plaintiffs were applying for press passes is itself a separate violation of reporters' due process rights under the Fourteenth Amendment. Moreover, the Guidelines do not define the term "bona fide journalist," thereby failing to memorialize an explicit and meaningful standard governing the denial of Plaintiffs press passes. *See Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1134 (D. Alaska 2021) (granting injunction because "the plaintiffs are likely to succeed on their due process claims given the government's failure to memorialize an explicit and meaningful standard governing its denial of press conference access").

**CLAIM II: VIOLATION OF RIGHTS TO FREE SPEECH AND PRESS (STATE)**

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

108. Article I, §5 of the Washington Constitution provides that "every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." *Id.*

109. This provision offers "greater protection than its federal counterpart," which is already remarkably robust. *State v. Noah,* 103 Wash.App. 29, 48, 9 P.3d 858 (2000). *See Adams v. Hinkle*, 51 Wash.2d 763, 784, 322 P.2d 844 (1958). The free-speech article of the Washington Constitution absolutely forbids *any* type of prior restraint, and guarantees an absolute right to publish and to broadcast accurate, lawfully obtained information that is a matter of public record. *State v. Coe*, 101 Wash.2d 364, 679 P.2d 353 (1984).

110. Taken together, Defendants' conduct in denying Plaintiffs' requests for press passes was unconstitutional insofar as it denied them their rights to free speech and press without

providing any compelling interest for doing so, as is required for a limited public forum such as those areas of the Capitol from which they, but not other reporters, were prohibited.

**CLAIM III: VIOLATION OF DUE PROCESS (FEDERAL)**

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

111. The Fourteenth Amendment to the U.S. Constitution provides, *i.a.*:

> *All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. Const. amend XIV, §1.

112. Here, the reasons provided for denying the press passes are at least as arbitrary and uncompelling as those in *Sherrill*. In *Sherrill v. Knight*, *supra,* the White House argued that the right of access due to the press is generally no greater than the right of access the public holds and therefore the absence of guidelines could only violate the First Amendment if denial was predicated on the content of the journalist's work. The court was persuaded that a press pass should not be denied for media access to government facilities and should "not be denied arbitrarily or for less than compelling reasons." *Id.* at 129–30.

***Notice***

113. Here, the reasons provided for the denial of the press passes are if not more arbitrary and uncompelling. The previously unpublished Guidelines are vague, inadequate and ambiguous so as to deny Plaintiffs notice of its requirements.

114. For example, the CCA Guidelines do not actually identify the criteria used to determine a "bona fide journalist" or even use that phrase. Decl. of Jackson Maynard, Ex C. In addition, Plaintiff Choe was prohibited from obtaining a press pass because he allegedly worked

for a "publication or information source that is part of a larger non-news organization; this includes think tanks." Decl. of Jackson Maynard, Ex. I.

115. The CCA Guidelines do not define news organization, although it does state that "[t]he entity must be doing news for the sake of news alone." *Id*. Ex. C. Choe has stated in his Declaration that he works for the Discovery Institute's news wing and "regularly produces journalistic content for national broadcast networks including ABC, NBC, FOX and CBS." Decl. of Jonathan Choe.

116. This definition is *so* vague as to be unworkable in today's media environment, as few news organizations are not "part of" a "non-news" organization—or, more accurately, an organization not solely engaged in newsgathering and reporting.

117. Also vague are the criteria for denying a requestor who "is or may become engaged in campaigns, lobbying, or the development of public policy." The policy further provides this applies to one who is "a part of, or may become involved with, a party, campaign, or lobbying organization." These were the criteria used (in part) to disqualify press passes to Plaintiffs Hoffman and Kruse. Decl. of Jackson Maynard, Ex. E and J. For the reasons argued above this is an impermissible viewpoint and content-based restriction in violation of the First Amendment.

118. It is also vague and ambiguous. Plaintiffs are not lobbyists. Decls. of Hoffman, Choe, and Kruse. There is no evidence to suggest they are registered lobbyists or engage in lobbying activity as defined by the Public Disclosure Commission.[7]

119. The problem is in determining who is "engaged in" or "part of" campaigns, lobbying, or the development of public policy. As discussed, several other news organizations have testified in favor of pending legislation and have editorial pages that support or oppose

[7] https://pdc.wa.gov/registration-reporting/lobbying

political candidates and policies. Decl. of Jackson Maynard, Composite Ex. C. The lack of clarity invites arbitrary enforcement, as transpired here.

120. In addition, the letters received from the Chief Clerk indicate that the Guidelines were only used "in part" to make the denial and such unwritten policies constitute a due process violation.

121. Defendants' denials are analogous to those sanctioned in *Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020), in which a federal appeals court held that the Trump White House's denial of a reporter's "hard pass" deprived the claimant of "explicit and meaningful standards" because they were not "formally articulated or published" despite the "magnitude of the sanction" *Id.* at 664–65. In *Karem*, it was a "month-long loss" of access—"an eon in today's news business." *Id.* at 665. That sanction is comparable to that imposed upon Plaintiffs here, especially since Defendants' repeated denials functionally deprived them of access for the remainder of the legislative session.

***Opportunity to Be Heard***

122. Defendants applied their vague, arbitrary, and ambiguous criteria to deny Plaintiffs their press passes without providing them any opportunity to be heard.

123. For example, as previously stated, Ms. Kruse responded to Defendants' initial denial letter, asking "Hello, The letter states I have worked on public policy development. I have not worked on public policy development. Can you provide precise information? . . . In regard to advocacy, does this mean any individual who has taken a position on policy may not be granted a press pass? The Seattle Times editorial board?"

124. Kruse was denied any realistic opportunity to be heard and to appeal her case. Nor were Hoffman or Choe, neither of whom received any guidance on how to appeal Defendants' decision and were therefore unable to meaningfully do so.

***Predictive Decision-making***

125. Finally, the CCA Guidelines violate due process insofar as they are the *de facto* rules for press admission and permit Clerk Dean to deny such a request to a reporter "who is part of, or ***may*** become involved with, a party, campaign[,] or lobbying organization." CCA Guidelines at V.

126. Conditioning press access on what the applicant ***may*** do in the future undermines due process in several respects.

127. First, it places the applicant in the impossible position of trying to guess what sort of conduct would be predictive of future party, campaign, or lobbying involvement. This creates a chilling effect, with reporters seeking to gain floor access apt to avoid a wide circle of otherwise permissible speech and conduct, for fear that the Clerk, applying the CCA Guidelines, will hold those against them. Second, it offers no guidance on how to comply, as there is no way to conform one's conduct to a standard whose application turns on someone else's prediction about their future. This is a recipe for arbitrary decision-making disguised as reasonable application of the governing standards. Third, a predictive standard almost guarantees viewpoint-based enforcement, because the only evidence of what someone "may" do is the content of what they have already said. *See City of Lakewood v. Plain Dealer Pub'g Co.*, 486 U.S. 750, 757 (1988) ("At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.").

128. In view of these procedural shortfalls, the CCA Guidelines facially violate due process insofar as they give the decisionmaker unfettered discretion, the abuse of which is effectively unprovable.

129. In sum, Plaintiffs have a constitutionally protected liberty interest in their profession as members of the media, and in equal, non-arbitrary access to legislative press credentials, where such credentials are made available to other similarly situated journalists. *Sherrill*, 569 F.2d at 129–30.

130. Defendants deprived Plaintiffs of that liberty interest by denying their applications for press credentials without providing: (a) advance written notice of the standards Defendants would apply; (b) any opportunity to respond to adverse information or to address Defendants' concerns before denial; (c) a written statement of the specific reasons for denial; or (d) any mechanism for administrative review or appeal of the denial.

**CLAIM IV: VIOLATION OF DUE PROCESS (STATE)**

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

131. The Washington Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." Art. I, §3. The state constitution protects individuals' due-process rights against arbitrary and capricious government action. *In re Estate of Hambleton* (2014) 181 Wash.2d 802, 335 P.3d 398 (2014), *cert. denied* 136 S.Ct. 318 (Mem), 577 U.S. 922, 193 L.Ed.2d 227 (2015).

132. If a court holds that a party asserts a protected interest, the court must then determine whether the proceedings below were sufficient to satisfy due process demands in light of the protected interest at stake. *LK Operating, LLC v. Collection Group, LLC* 181 Wash.2d 48, 331 P.3d 1147 (2014). Generally, the Due Process Clause of the Washington Constitution does not

afford broader protection than that offered by the Fourteenth Amendment. *State v. Beaver* 184 Wash.App. 235, 336 P.3d 654 (2014), affirmed 184 Wash.2d 321, 358 P.3d 385 (2015). To satisfy due-process requirements, targets of enforcement must be given the opportunity to be heard at a "'meaningful time and in a meaningful manner . . . appropriate to the case.'" *Bellevue Sch. Dist. v. E.S.* 171 Wash.2d 695, 257 P.3d 570 (2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

133. For the reasons set forth in Claim III, which are incorporated here by reference, Defendants' credentialing scheme violates Plaintiffs' due-process rights because it (1) fails to provide pre-decision notice of applicable standards understandable to a person of ordinary intelligence; (2) offers no opportunity to be heard; (3) provides no written statement of reasons; and (4) provides no formalized mechanism for review. The denials of Plaintiffs' press passes were based on unpublished, vague, and ambiguous criteria that were inconsistently applied, without any means to meaningfully challenge or appeal the denials, in violation of Article I, § 3.

### CLAIM V: VIOLATION OF THE NON-DELEGATION DOCTRINE (STATE)

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

134. Under the nondelegation doctrine, the legislature may grant regulatory authority to private parties only if proper standards, guidelines, and procedural safeguards exist. *Entertainment Indus. Coal. v. Tacoma-Pierce Cnty. Health Dep*'t, 153 Wash.2d 657, 105 P.3d 985 (2005).

135. To the extent the House of Representatives claims to delegate to the CCA, a private entity, the authority to impose guidelines affecting Plaintiffs' constitutional rights to freedom of speech and press and to decide whether to grant press passes, such a delegation violates the nondelegation doctrine because proper standards, guidelines, and procedural safeguards do not exist to protect Plaintiffs' rights.

136. Moreover, Washington state law disfavors private groups "advancing the pecuniary interests of the members of the favored groups through their licensing and disciplinary practices and standards." *Long v. Chiropractic Soc'y of Wash.*, 93 Wn.2d 757 ; 613 P.2d 124 (1980). This is exactly what is occurring, the CCA is preventing members of the press from gaining access to members of the legislature by promulgating and enforcing Guidelines that purport to regulate press qualifications or access. Access to the wings of the House of Representatives should not depend on whether Jerry Cornfield, another member of the press, approves of an applicant's work or affiliations. This is the sort of harm that *Long* sought to avoid and why the non-delegation doctrine exists.

137. The House of Representatives rules provide no standards by which the CCA can determine whether the guidelines it adopts are consistent with the Legislature's intent.

138. The House of Representatives Rules contain no mechanism for challenging arbitrary actions by the CCA or remedying the abuse of the CCA's discretionary power.

139. This delegation fails even the deferential test of *Barry & Barry, Inc. v. Dep't of Motor Vehicles*, 81 Wash.2d 155, 500 P.2d 540 (1972), because the legislature has provided neither (a) statutory standards defining in general terms what the credentialing body is to do, nor (b) procedural safeguards adequate to control arbitrary action. *Id.* at 159–60.

140. Without standards for determining which members of the press may obtain passes or for challenging the arbitrary exercise of the CCA's authority, the process utilized by the House of Representatives is an unconstitutional delegation of legislative power.

## VI. <u>RELIEF SOUGHT</u>

### A. DECLARATORY JUDGMENT

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

141. Plaintiffs seek declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, which empowers this Court "[i]n a case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party" and to grant "[f]urther necessary or proper relief."

142. Plaintiffs have rights, status, and other legal relations that are affected by the denial of the press passes outlined in this Petition and seek to have determined a question of construction or validity arising under the statute and to obtain a declaration of rights, status, or other legal relations thereunder.

143. An actual dispute exists between Plaintiffs and Defendants, who have genuine and opposing interests that are direct and substantial, and of which a judicial determination would be final and conclusive.

144. Plaintiffs respectfully request that this Court declare: (a) that CCA is a state actor for purposes of the First and Fourteenth Amendments and 42 U.S.C. § 1983; (b) that the CCA Guidelines, as adopted and applied by the House of Representatives, violate the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 3 and 5 of the Washington Constitution, both facially and as applied to Plaintiffs; (c) that Defendants' denial of House floor press credentials to Plaintiffs in the 2026 session violated their rights under those provisions and 42 U.S.C. § 1983; and (d) that the House's delegation of credentialing authority to CCA, without published standards or procedural safeguards, violates the non-delegation doctrine and Article II, § 1 of the Washington Constitution.

**B. Injunctive Relief**

Plaintiffs reallege the preceding paragraphs and incorporate them by reference in this request for injunctive relief.

145. This is a petition for injunctive relief in which Plaintiffs seek an injunction.

146. Plaintiffs satisfy the four-factor test for permanent injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (to obtain such relief, "a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction").

147. *First*, Plaintiffs have suffered, and will continue to suffer, irreparable injury, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009).

148. *Second*, remedies at law are inadequate to compensate for the deprivation of constitutional rights and the loss of newsgathering opportunities that, by their nature, cannot be recreated.

149. *Third*, the balance of equities favors Plaintiffs: Defendants have no cognizable interest in maintaining a credentialing scheme that violates the First and Fourteenth Amendments, and Plaintiffs face the recurring exclusion of three working journalists from a forum the State Defendants admit is open to professional members of the press.

150. *Fourth*, the public interest is served by the vindication of First Amendment rights and by ensuring that legislative proceedings are reported by a press corps unfiltered by viewpoint-based gatekeeping. *See Klein*, 584 F.3d at 1208 ("We have also consistently recognized the 'significant public interest' in upholding free speech principles.").

151. Plaintiffs reserve the right, on a developed record, to move under Federal Rule of Civil Procedure 65 for preliminary injunctive relief in advance of the 2027 legislative session to prevent the recurrence of the credentialing denials at issue. The relief Plaintiffs seek is, at least in part, prospective and forward-looking; it is not barred by Eleventh Amendment immunity as to the State Defendants. *See Ex parte Young*, 209 U.S. 123 (1908).

## VII. DEMAND FOR JURY TRIAL

Plaintiffs elect to have all claims and issues in the above-captioned case tried by a jury of six persons.

## VIII. PRAYER FOR RELIEF

Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein. Plaintiffs request the following relief:

152. For a judgment declaring that the press pass scheme for the House of Representatives is unconstitutional and violative of freedom of the press under the federal and/or state constitutions, as well as the non-delegation doctrine.

153. For a judgment declaring that the press passes were improperly denied to Plaintiffs and ordering Defendants to only deny them future press passes if accompanied by a fulsome explanation of the non-arbitrary grounds for denial.

154. For an order permanently enjoining the State from enforcing the press pass scheme as perpetrated, which, *i.a.*, would therefore include a demand to clarify, by its official rulemaking process, whether or not the CCA Guidelines are grounds for denial.

155. For nominal damages sustained by Plaintiffs for denial of their press passes with an amount to be determined at trial.

156. For attorneys' fees and costs pursuant to 42 U.S.C. § 1983(b) and any other applicable statute or rule.

157. For punitive damages in an amount to be determined at trial.

158. Award Plaintiffs all costs incurred in connection with this action, including reasonable attorney fees.

159. Award any other relief as the Court deems fair, just, or equitable.

I certify that this Petition contains 10,526 words, in compliance with the Local Civil Rules.

DATED this 23rd day of July, 2026.

*/s/ Jackson Maynard*
JACKSON WILDER MAYNARD, JR.
WSBA No. 43481
111 21st Ave SW
Olympia, WA 98501
(850) 519-3495

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Jackson Maynard, hereby declare under penalty of perjury under the laws of the State of Washington that I am causing a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are registered CM/ECF users.

**Jessica L. Goldman**
Eva S. Oliver
315 Fifth Avenue
Suite 1000
Seattle, WA 98104-2682
*Counsel for State Defendants*

**Katherine George**
Johnston George LLP
2800 First Avenue Suite 226
Seattle, Washington 98121
*Counsel for Defendant Washington State Capitol Correspondents Association*

DATED this 23rd day of July, 2026.

*/s/ Jackson Maynard*
JACKSON WILDER MAYNARD, JR.
WSBA No. 43481
111 21st Ave SW
Olympia, WA 98501
(850) 519-3495

*Attorney for Plaintiffs*